# Richmond

James E. Cary, Sr., Administrator &c. v.
Hotel Rueger, Incorporated, &c., et al.

May 3, 1954.

Record No. 4195.

Present, All the Justices.

The opinion states the case.

*George E. Allen; Allen, Allen, Allen & Allen* and *W. Hooker Harbour*, for the plaintiff in error.

*Robert G. Butcher* and *Parrish, Butcher & Parrish*, for the defendants in error.

Smith, J., delivered the opinion of the court.

This is an action by James E. Cary, Sr., administrator of the estate of Homer Robert Cary, hereinafter referred to as plaintiff, against Hotel Rueger, Inc. and others, hereinafter referred to as defendants, to recover for the alleged wrongful death of plaintiff's decedent, which was caused by defendants' servant, one George Frazier (not a party to this action).

At the conclusion of the plaintiff's evidence the defendants moved the court to strike all the plaintiff's evidence, on the ground that it did not show that when Frazier committed the act complained of, he was acting within the scope of his employment. This motion was sustained, the jury then returned a verdict in favor of the defendants, and the court entered judgment thereon.

The sole question presented for our consideration is whether this action of the trial court was correct.

George R. Frazier, a bellboy in the employ of the defendants, around 3.00 a. m., on July 22, 1951, shot and killed Homer Cary. The shooting resulted from a dispute over money which Homer and his brother, Frank Cary, claimed Frazier owed them.

A short time before the shooting, Frazier, in response to a call from a guest on the eighth floor of the hotel, went to the basement for ice, placed it in the check room and stepped outside the hotel for a sandwich. Upon his return, he got the ice and started to the guest's room. In the lobby of the hotel he met the two Cary brothers and John Hunter, another bellboy. The Cary brothers accused Frazier of having received money belonging to them which he had not turned over. This he denied and asked them to wait there in the lobby until he delivered the ice, but they refused to do so, whereupon all four entered the elevator.

When they reached the first floor Frazier stopped the elevator and asked the Cary brothers to get off and wait at the room they occupied on that floor until he returned. They refused to do so, and the argument continued while the elevator proceeded to the eighth floor.

Frazier testified that when the elevator stopped on the eighth floor, "I reached behind me to pick up the pitchers that I had ice cubes in, that is when Frank Cary, * * * grabbed me by the left arm and Homer Cary threatened and also cursed at me, which he had already threatened before, and in the squabble with Frank Cary I was trying to get away from him to leave the elevator. Prior to that, when Homer Cary threatened me, he reached in his pocket as if he was reaching for something. * * * When he was reaching for something, I thought it was time for me to do something to defend myself, with one grabbing me and the other reaching for his pocket, and I had a small automatic in my pocket, which I drew and accidentally fired."

Frazier testified on cross examination:

"Q. George, you have been asked a number of questions here regarding money that the Carys said that you had that belonged to them, and I think you also said that you had been called up to their room on several occasions before this final altercation took place. Under what circumstances did they say that you had money that belonged to them?

"A. It was money that I was supposed to have. I was accused of taking two girls up there that they had on some dates. That is the nature of the calls from the room. Each time they called up, they wanted to know if they could get someone to cooperate with them and two girls to hustle in the house."

He also testified that "it was strictly against the rules of the hotel" to traffic in women or whiskey, and that "it was understood that I would be dismissed from the hotel and probably punished by law if I was caught trafficking in them." He further said that it was understood that when he was on duty he was not supposed to carry any weapons;

that he was furnished with a private locker in which to keep his personal belongings.

The only other evidence offered on behalf of the plaintiff was a written statement of John Hunter, the other bellboy, which by agreement of counsel was read to the jury as a deposition and is as follows: "I got a call to go to Room 120 about 2:55 a. m. and a white man in that room said I owed him some money. I told him that I did not owe him any money, that it might be No. 11; that it was the two of us on duty. He then said, 'Where is the other boy' and I told him the other boy was downstairs. He said, 'We will go downstairs and see the other boy' and we got on the elevator and went downstairs. George (No. 11 Bellboy) was on the first floor with an ice bucket in his hand and said he was going to 8th floor to carry ice. Two boys (they are brothers but I do not know their names) George and myself got on the elevator and was going up to the 8th floor. These two fellows told George he owed them some money and it was going to be a fight if he did [not] pay them the money. George said 'make it light on yourself' and jumped back and pulled out a pistol and shot one time. He had stopped the elevator at the 8th floor before shooting."

There is only one assignment of error and it is as follows: "The Court erred in striking out the evidence offered on behalf of the plaintiff because the uncontradicted evidence showed that the bell boy at the time he shot Homer R. Cary was engaged in performing a service for the defendant which he was employed to perform and which was within the ordinary course of defendant's business and within the scope of the authority of the bell boy."

This assignment of error, the briefs and oral argument have restricted and limited the question here to the single issue of whether the evidence shows that Frazier was acting within the scope of his employment when he shot Homer Cary. The plaintiff contends that "the service itself in which the tortious act was done was within the ordinary

course" of the defendants' business, and therefore the defendants are liable for the tortious act.

The real questions, however, are can it be said that the tortious act (1) was an act fairly and naturally incident to the business of the employer, and (2) was it done with a view to further the master's interests or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise from some external, independent and personal motive on the part of the servant to do the act upon his own account? *Tri-State Coach Corporation* v. *Walsh*, 188 Va. 299, 49 S. E. (2d) 363. See also, 2 Mechem on Agency (2d ed.) § 1960; 12 M. J., Master and Servant, § 99, p. 603.

If the employee steps aside from the employer's business to do acts not connected with such business, the relationship of master and servant is for the time suspended and the servant is not acting within the scope of his employment. While this principle is well recognized the exact line of demarcation between an act within and an act beyond the scope of employment is a difficult one to establish. *Tri-State Coach Corporation* v. *Walsh, supra.* Numerous factual patterns on the various kinds of conduct in this respect are classified and analyzed in the Restatement of Agency, § 229 *et seq.* See also, 23 Minn. L. Rev. 981; 45 Harv. L. Rev. 376; 26 Iowa L. Rev. 896.

This case presents no new principle and citation of additional authority is unnecessary since its disposition is controlled by *Tri-State Coach Corporation* v. *Walsh, supra.* In that case an argument arose between Mooney, a bus driver, who was employed by Tri-State Coach Corporation, and Walsh, involving their respective rights in the street when the bus driver undertook to make a right turn which Walsh was apprehensive would bring the bus in collision with his automobile. The bus driver left his vehicle before completing the turn and struck Walsh in the face, rendering him unconscious and causing him to lose control of his automobile resulting in damage thereto.

In holding that the bus driver was acting within the scope of his employment, Mr. Justice Miller said: "It must be remembered that the altercation arose about the manner in which Mooney was operating the bus. It occurred while he was undertaking to make a right turn which plaintiff was apprehensive would bring the bus in collision with his car.

"Both drivers claimed rights on the road and the tort was inflicted by Mooney in asserting his claim and in executing the service for which he was employed. The blow was struck before the turn was negotiated and it was a part of Mooney's contention that he was rightfully in position on the highway to make such turn. He insisted that the signal lights having indicated his intention to turn, therefore he was entitled to turn in front of the plaintiff's car. In furtherance of this intention and claimed right so to operate the bus though its proximity gave concern to plaintiff, Mooney committed the tort." 188 Va., at page 304.

Then in distinguishing acts within the scope of employment from those not within the scope of employment, it was there said:

"*Had the turn been wholly negotiated* into State Street, thus avoiding the real or apparent danger of collision, and Mooney had then *abandoned the business of his master* and committed the tort solely to gratify his personal feelings and not to accomplish or effect his insistence upon his right of movement, it would not have been within the scope of his employment; but here it was committed in the very *act of negotiating the turn.* It was part and parcel of Mooney's insistence and contention that he was properly operating the bus and intended to insist upon his rights in the highway. Because his demands were physical and emphatic renders it no less in furtherance of the master's business." (Italics supplied). 188 Va., at page 305.

Thus, where an assault is made by a servant as the result of an argument, in order to determine whether or not the assault was within the scope of the servant's employment

one must look to the cause of the argument. This conclusion is not inconsistent with, but is in accord with the holding in *Davis* v. *Merrill*, 133 Va. 69, 112 S. E. 628, relied on by the plaintiff. It was there said: "In the instant case the contention [argument] arose over the raising of the gates at a late hour of the night, a matter admittedly within the scope of the gateman's employment and duty, and as an immediate result thereof, the gateman shot and killed the deceased. The two acts constitute parts of one and the same transaction." 133 Va., at page 77.

The plaintiff also relies on *Murphy's Hotel* v. *Cuddy's Adm'r*, 124 Va. 207, 97 S. E. 794; *Meador* v. *Hotel Grover, et al*, 193 Miss. 392, 9 So. (2d) 782; *Rapee* v. *Beacon Hotel Corp.*, 293 N. Y. 196, 56 N. E. (2d) 548. In each of these cases the injured guest recovered a judgment against the hotel for either the negligent maintenance or negligent operation of an elevator.

Here liability is not based on a common carrier relationship and there is no allegation or proof of negligent maintenance or negligent operation of the elevator. But plaintiff's case is predicated solely upon the contention that the injury was inflicted by an employee of the hotel while the employee was acting within the scope of his employment.

Although the argument in the instant case resulted in an injury on defendants' elevator, which was being operated by defendants' employee, the argument did not arise out of anything connected with the elevator or its operation. In the *Tri-state Coach Corporation* case, *supra*, the argument arose out of the operation of a bus, which was a duty of the employee. In the *Davis* case, *supra*, the argument arose out of the raising and lowering of gates over the railroad at a street crossing, which was a duty of the employee. The injury here was the result of an argument between the Cary brothers and the defendants' employee as to whether Frazier had collected money for an unlawful act which the Cary brothers claimed was due them.

It is true that the fatal shooting took place on the hotel's

elevator while Frazier was operating it, but the shooting did not arise out of this service. The injury was not caused by any defect in the elevator; or its faulty operation; or by an incompetent operator. Nor did the shooting result from any argument over the manner of the operation. The elevator merely happened to be the location where the shooting occurred. Yet because it did happen on the elevator which the servant was employed to operate for the master, the plaintiff contends that the service of operating the elevator renders the employer liable for an injury inflicted by such employee as a result of a personal dispute.

We hold, however, that the shooting of Cary by Frazier was not an act fairly and naturally incident to the business of the hotel, his employer; it was not done with a view to further the hotel's interest or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, but arose from an independent and personal motive on the part of Frazier to do the act upon his own account. Frazier therefore was not acting within the scope of his employment when he shot Cary. Accordingly, the trial court did not err in striking the plaintiff's evidence and entering judgment upon the verdict of the jury in favor of the defendants. The judgment of the trial court is affirmed.

*Affirmed.*