# COMMERCIAL BUSINESS SYSTEMS, INC.

### ·V.

# BELLSOUTH SERVICES, INC.

Record No. 940121

January 13, 1995

Present: Carrico, C.J., Compton, Stephenson, Whiting, Lacy, and Keenan, JJ., and Cochran, Retired Justice

*H. Kenneth Kudon; Paul T. Gallagher (Christine A. Nykiel; Richard L. Locke; Jackson & Campbell; Mezzullo & McCandlish*, on briefs), for appellant.

*Douglas W. Davis (Cynthia S. Cecil; Hunton & Williams*, on brief), for appellee.

JUSTICE STEPHENSON delivered the opinion of the Court.

In this appeal, we determine whether the trial court erred in granting summary judgment in favor of the defendant, resulting in the rejection of the plaintiff's claims of statutory and common law conspiracy and of respondeat superior.

## I

Commercial Business Systems, Inc. (CBS) filed a motion for judgment against BellSouth Services, Inc. (BellSouth) after BellSouth's employee, Jerry H. Waldrop, awarded a contract to CBS's competitor, Halifax Engineering, Inc. (Halifax), in exchange for commercial bribes. CBS asserted three claims: (1) a statutory conspiracy to injure CBS in its trade or business, in violation of Code § 18.2-499; (2) a common law conspiracy to injure CBS's business; and (3) tort liability imputed to BellSouth under the doctrine of respondeat superior. CBS sought to recover lost profits and punitive damages.

Following extensive discovery, BellSouth moved for summary judgment on all three of CBS's claims. In response, CBS filed a cross-motion for partial summary judgment, asserting that, as a matter of law, Waldrop had acted within the scope of his employment with BellSouth when he engaged in improper conduct. The trial court granted summary judgment in favor of BellSouth, and we awarded CBS an appeal.

## II

Summary judgment shall not be granted if any material fact is genuinely in dispute. Rule 3:18. In considering a motion for summary judgment, a court must adopt those inferences from the facts that are most favorable to the nonmoving party, unless the

inferences be strained, forced, or contrary to reason. *Carson* v. *LeBlanc*, 245 Va. 135, 139-40, 427 S.E.2d 189, 192 (1993).

BellSouth was created to perform "selected staff and planning functions" for Southern Bell and SouthCentral Bell Telephone Companies, including contracting for the repair and refurbishment of computer equipment. In July 1985, BellSouth awarded CBS a two-year contract to repair Digital Equipment Corporation (DEC) equipment. The contract commenced on July 29, 1985, and provided that either party could cancel upon 60 days' written notice. The contract also permitted BellSouth to send equipment covered by the contract to other repair vendors.

William Jordan, a BellSouth employee, had negotiated the contract with CBS and had administered the contract for 18 months. Jordan was satisfied with CBS's performance and told CBS that it could "reasonably expect" renewal of the contract. BellSouth preferred to renew contracts with incumbent vendors "unless documentation of non-performance [was] present."

By early 1987, Waldrop had replaced Jordan as BellSouth's contract negotiator and administrator and had begun to administer CBS's contract. Previously, Waldrop had negotiated and administered a small, two-year contract with Halifax for the repair of Mannesmann Tally equipment. That contract had commenced on January 1, 1986, and Halifax's performance under the contract had been unsatisfactory. Halifax had lost some of BellSouth's equipment and had not met BellSouth's turnaround time requirements. Nonetheless, in late 1986, Waldrop began contract discussions with Halifax for the repair of DEC equipment.

In early 1987, CBS attempted to discuss with Waldrop the renewal of its contract with BellSouth. CBS repeatedly telephoned Waldrop, but Waldrop failed to respond to the calls. In the meantime, Waldrop contacted Wayne Berry, a former CBS official, to ask Berry to become a consultant to an unidentified BellSouth vendor who was having difficulty repairing DEC equipment. According to Berry, when he asked Waldrop about CBS's status, Waldrop indicated that he was "working on" a reason not to renew CBS's contract. Referring to CBS, Waldrop told Berry that he was "not through doing what I got to do." Although Waldrop had never previously administered any contract with CBS, he told Berry that, if he, instead of Jordan, had been in charge, CBS never would have obtained the contract to repair DEC equipment.

Later, Waldrop identified Halifax as the vendor to whom he had previously referred as having difficulty.

In May 1987, Waldrop told CBS's chief executive officer that he was concerned about "warranty problems" and CBS's "financial problems." The substance of Waldrop's statements, however, was false.

Then, on June 15, 1987, Waldrop wrote CBS that its contract would not be renewed in order to offer BellSouth's clients the "best in quality and service" by "opening that market to other qualified vendors and encouraging competition." By July 1987, BellSouth had begun shipping DEC equipment to Halifax for repairs. On July 28, 1987, CBS's contract expired.

Thereafter, Waldrop awarded Halifax a two-year contract to repair DEC equipment for specified compensation. The contract commenced on January 1, 1988, and Halifax's compensation was subject to renegotiation after six months. In spite of Waldrop's stated desire to encourage competition, the record shows that Halifax was the only vendor to whom Waldrop awarded a contract to repair DEC equipment. Although Halifax's performance under the contract was substandard during the first six months of the contract period, Waldrop agreed to amend the contract to allow Halifax additional compensation.

■ The record clearly established that Waldrop committed serious violations of BellSouth's conflict-of-interest rules. Waldrop established his own company, called EntraCom Corporation, as a means to conduct business with Halifax and other companies that provided services to BellSouth, and he accepted bribes from Halifax in the form of "kickbacks" on transactions between Halifax and EntraCom.

Consequently, in early 1989, upon learning of Waldrop's self-dealing, BellSouth terminated Waldrop's employment. In May 1989, BellSouth canceled its contract with Halifax.

## III

■ We first consider whether the trial court erred in ruling, by way of summary judgment, that, as a matter of law, Waldrop was not acting within the scope of his employment with BellSouth when he engaged in wrongful conduct. It is well settled that, when an agency relationship has been proven, the burden is upon the principal to show that the agent was not acting within the scope of his authority when he committed the acts complained of, and, if

the evidence leaves the question in doubt, it becomes an issue for determination by a jury. *United Brotherhood* v. *Humphreys*, 203 Va. 781, 787, 127 S.E.2d 98, 102 (1962), *cert. denied*, 371 U.S. 954 (1963); *Alvey* v. *Butchkavitz*, 196 Va. 447, 453-54, 84 S.E.2d 535, 539 (1954).

■ Although the doctrine of respondeat superior is firmly established in Virginia, difficulties commonly arise in applying the doctrine to particular facts. Often, the inferences to be drawn from the facts proved are within the province of a jury. *Tri-State Coach Corp.* v. *Walsh*, 188 Va. 299, 308, 49 S.E.2d 363, 367 (1948). In determining whether an agent's tortious act is imputed to the principal, the doctrine's primary focus is on whether the activity that gave rise to the tortious act was within or without the agent's scope of employment. *See, e.g., Tri-State Coach Corp.*, 188 Va. at 305-06, 49 S.E.2d at 366; *Davis* v. *Merrill*, 133 Va. 69, 77-78, 112 S.E. 628, 631 (1922); *Henry Myers & Co.* v. *Lewis*, 121 Va. 50, 71, 92 S.E. 988, 994-95 (1917).

■ In *Davis*, a railroad gateman became agitated when a motorist asked him to raise the gate. After the gateman raised the gate, he shot at the vehicle and killed one of its occupants. A jury returned a verdict in favor of the deceased's personal representative against the gateman's employer. 133 Va. at 71-72, 112 S.E. at 628-29. In rejecting the employer's contention that the gateman, as a matter of law, acted outside the scope of his employment, we stated that

> the test of the liability of the master for the tortious act of the servant, is not whether *the tortious act itself* is a transaction within the ordinary course of the business of the master, or within the scope of the servant's authority, but whether *the service itself, in which the tortious act was done*, was within the ordinary course of such business or within the scope of such authority.

*Id.* at 77-78, 112 S.E. at 631 (emphasis added); *accord United Brotherhood*, 203 Va. at 786, 127 S.E.2d at 102.

■ In *Tri-State Coach Corp.*, an altercation arose between the plaintiff, a motorist, and a bus driver employed by the defendant bus company when the bus driver was attempting to make a right turn and the plaintiff became apprehensive that a collision with his vehicle would occur. The motorist called out to the bus driver,

and the driver stopped the bus. The bus driver then left his vehicle and, after the two men exchanged words, struck the plaintiff in the face, rendering him momentarily unconscious. The blow caused the plaintiff to lose control of his vehicle, which crossed a sidewalk and struck a building, causing damage to the vehicle. A jury returned a verdict for the plaintiff against the bus company, on which the trial court entered judgment. 188 Va. at 301-03, 49 S.E.2d at 364-65. The bus company contended that the driver, as a matter of law, was acting beyond the scope of his employment when he struck the plaintiff and, therefore, the company was not liable. *Id.* at 304, 49 S.E.2d at 365. We rejected the bus company's contention and affirmed the judgment, stating the modern and better view as follows:

> The courts . . . have long since departed from the rule of non-liability of an employer for wilful or malicious acts of his employee. Under the modern view, the wilfulness or wrongful motive which moves an employee to commit an act which causes injury to a third person does not of itself excuse the employer's liability therefor. The test of liability is not the motive of the employee in committing the act complained of, but whether that act was within the scope of the duties of employment and in the execution of the service for which he was engaged.

*Id.* at 305-06, 49 S.E.2d at 366. We also noted that *Davis* and *Lewis* adhered to this modern view. *Id.* at 306, 49 S.E.2d at 366.

In contradistinction to *Tri-State Coach Corp.* and *Davis* is *Cary* v. *Hotel Rueger, Inc.*, 195 Va. 980, 81 S.E.2d 421 (1954). In *Cary*, a bellman employed by a hotel company was in an elevator, on his way to deliver ice to a guest's room, when two acquaintances accosted him about a personal debt the bellman allegedly owed them. An argument escalated into a scuffle, and the bellman shot and killed one of the acquaintances. The decedent's personal representative sued the hotel company, relying on the doctrine of respondeat superior, and the trial court struck the plaintiff's evidence, ruling that the bellman, as a matter of law, was not acting within the scope of his employment when he fired the shot. *Id.* at 981-82, 81 S.E.2d at 421-22. We affirmed the trial court's judgment. *Id.* at 987, 81 S.E.2d at 424. In doing so, we

explained the basis for our ruling and distinguished *Tri-State Coach Corp.* and *Davis* as follows:

> Although the argument in the instant case resulted in an injury on defendants' elevator, which was being operated by defendants' employee, the argument did not arise out of anything connected with the elevator or its operation. In the *Tri-State Coach Corporation* case, *supra*, the argument arose out of the operation of a bus, which was a duty of the employee. In the *Davis* case, *supra*, the argument arose out of the raising and lowering of gates over the railroad at a street crossing, which was a duty of the employee.

*Id.* at 986, 81 S.E.2d at 424.

■ In the present case, the facts presented by BellSouth and relied upon by the trial court do not conclusively establish that Waldrop was not acting within the scope of his employment when he committed the wrongful acts. Unquestionably, Waldrop's conduct was outrageous and violative of his employer's rules. His motive was personal—to advance his self-interest, rather than the interest of BellSouth. And yet, Waldrop's willful and malicious acts were committed while Waldrop was performing his duties as BellSouth's contract negotiator and administrator and in the execution of the services for which he was employed.

■ We hold, therefore, that the evidence presents a jury issue whether Waldrop acted within the scope of his employment when he committed the wrongful acts. Consequently, the trial court erred in granting summary judgment in favor of BellSouth on CBS's claim of respondeat superior.

## IV

Next, we consider whether the trial court erred in granting summary judgment in favor of BellSouth on CBS's statutory conspiracy claim. BellSouth argues on appeal, as it did in the trial court, that the claim fails because the conspiracy statutes require proof of *actual* malice and because no evidence exists to prove that Waldrop harbored personal hatred or ill-will toward CBS.*

---

\* Apparently, this argument was the basis for the trial court's ruling. In its final order, the trial court did not state the bases for its ruling. We will assume, as does BellSouth, that the trial court adopted all arguments made below by BellSouth.

The conspiracy statutes provide, in pertinent part, that "[a]ny two or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring another in his . . . trade [or] business . . . by any means whatever" shall be liable civilly for treble damages. Code §§ 18.2-499 and -500.

We reject BellSouth's contention that the conspiracy statutes require proof of actual malice. Although a jury reasonably could conclude that Waldrop harbored personal spite against CBS, we think the statutes merely require proof of legal malice, *i.e.*, that Waldrop acted intentionally, purposely, and without lawful justification. *See Worrie* v. *Boze*, 198 Va. 533, 543, 95 S.E.2d 192, 200 (1956); *Scott* v. *Shelor*, 69 Va. (28 Gratt.) 891, 909-10 (1877).

Relying upon *Greenspan* v. *Osheroff*, 232 Va. 388, 351 S.E.2d 28 (1986), BellSouth further contends that, to establish a claim under the conspiracy statutes, "CBS must demonstrate that Waldrop's *primary and overriding purpose* was to injure CBS's trade or business" or "at least demonstrate that the allegedly concerted action was in part for the purpose of injuring [CBS's] business." (Emphasis added.) Continuing, BellSouth asserts that the impact on CBS from the alleged conspiracy "was merely incidental to the central purpose of the conspiracy which was to mutually benefit Waldrop and Halifax."

A close reading of *Greenspan*, however, reveals that this Court's statement about the conspirator's "primary and overriding purpose," *id.* at 398-99, 351 S.E.2d at 35-36, was made in the context where the conspirator had both legitimate and illegitimate motives for his actions. In the present case, all of Waldrop's motives were illegitimate, and, in any event, we do not think that, as a general proposition, the conspiracy statutes require proof that a conspirator's primary and overriding purpose is to injure another in his trade or business. The statutes do not so provide, and such a requirement would place an unreasonable burden on a plaintiff.

We conclude, therefore, that CBS's statutory conspiracy claim is a matter for determination by a jury.

## V

Now we consider whether the trial court erred in granting summary judgment in favor of BellSouth on CBS's common law

conspiracy claim. CBS asserts that its evidence of common law conspiracy was sufficient for submission to a jury.

A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means. *Hechler Chevrolet* v. *General Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d 744, 748 (1985); *Werth* v. *Fire Adjust. Bureau*, 160 Va. 845, 855, 171 S.E. 255, 259, *cert. denied*, 290 U.S. 659 (1933). The foundation of a civil action of conspiracy is the damage caused by the acts committed in furtherance of the conspiracy. *CaterCorp, Inc.* v. *Catering Concepts, Inc.*, 246 Va. 22, 28, 431 S.E.2d 277, 281-82 (1993); *Gallop* v. *Sharp*, 179 Va. 335, 338, 19 S.E.2d 84, 86 (1942). Whether a conspiracy caused the alleged damage ordinarily is a question for a jury. *See Middlesboro Coca-Cola* v. *Campbell*, 179 Va. 693, 702, 20 S.E.2d 479, 482 (1942).

BellSouth contends that the facts alleged by CBS fail to establish that a conspiracy existed *before* CBS's contract expired and that, but for the conspiracy, CBS's contract would have been renewed. We do not agree with this contention. The evidence shows that Waldrop and Halifax unlawfully conspired to injure CBS in its business during the several months before CBS's contract expired and that Halifax paid the bribes to Waldrop in exchange for the contract to repair DEC equipment. The payment of the bribes shortly after the expiration of CBS's contract supports CBS's contention that the purpose of the conspiracy was to injure CBS by steering its business to Halifax. The evidence also shows that CBS's performance under its contract was satisfactory and that CBS was told that it could expect renewal of the contract.

BellSouth further contends that, because its contract with CBS was nonexclusive and terminable upon 60-days' notice, any renewal was a mere expectancy and any injury to CBS was independent of and not caused by the alleged conspiracy. We also reject this contention. A jury reasonably could find, from the evidence, that Waldrop and Halifax conspired to destroy CBS's reasonable business expectancy.

We conclude, therefore, that CBS's common law conspiracy claim is a matter for determination by a jury.

## VI

The final issue in this appeal relates to proof of damages. Bell-South contends that CBS's damage evidence was speculative, and apparently the trial court so ruled.

As previously stated, Waldrop, on behalf of BellSouth, informed CBS that its contract would not be renewed. Thereafter, only Halifax was permitted to bid on the contract to repair DEC equipment, and the contract awarded to Halifax was the only such contract awarded for the two-year period following the expiration of CBS's contract.

CBS represented to the trial court that it would present its damage evidence through its expert, Robert Raymond, a certified public accountant. Raymond had access to Halifax's repair records during the period June 1987 through May 1989, which period included the term of Halifax's contract to repair DEC equipment. These records consisted of "monthly average prices, quantities, and turnaround time[s]" for the equipment Halifax repaired. Raymond also had access to CBS's "transaction records" relating to its two-year contract, as well as payroll and other financial records for the two-year period.

Using data from these sources, Raymond prepared a "damage model." In the model, Raymond estimated the "contract prices to be charged by CBS under a contract equivalent to [Halifax's] contract." He then applied these prices to the "probable number of units of equipment that CBS would have refurbished," which number was based upon the "average monthly units" Halifax repaired under its contract. By doing so, Raymond arrived at the "estimated gross revenues" CBS would have earned under such an equivalent contract. Relying upon CBS's financial records, Raymond then itemized the "specific incremental costs" that would have been incurred in performing such a contract. To determine CBS's lost profits, Raymond deducted the incremental costs of performing the equivalent contract from the estimated gross revenues CBS would have earned under such contract.

■ Ordinarily, it is the function of a jury to determine whether and to what extent a plaintiff has been damaged. *Middlesboro Coca-Cola*, 179 Va. at 702, 20 S.E.2d at 482. A plaintiff is not required to prove the amount of his damages with mathematical precision; he is required only to produce sufficient facts and circumstances that will permit a jury to make an intelligent

and reasonable estimate of the amount. *Goldstein* v. *Kaestner*, 243 Va. 169, 173, 413 S.E.2d 347, 349-50 (1992).

BellSouth, relying largely upon *ADC Fairways Corp.* v. *Johnmark Const., Inc.*, 231 Va. 312, 343 S.E.2d 90 (1986), contends that CBS's revenue and cost estimates under a contract equivalent to Halifax's contract were too speculative as a matter of law. BellSouth further contends that CBS's evidence violated the so-called "new business rule." This rule was stated in *Mullen* v. *Brantley*, 213 Va. 765, 768, 195 S.E.2d 696, 699-700 (1973), as follows:

> When an established business, with an established earning capacity, is interrupted and there is no other practical way to estimate the damages thereby caused, evidence of the prior and subsequent record of the business has been held admissible to permit an intelligent and probable estimate of damages. . . . But where a new business or enterprise is involved, the rule is not applicable for the reason that such a business is a speculative venture, the successful operation of which depends upon future bargains, the status of the market, and too many other contingencies to furnish a safeguard in fixing the measure of damages.

(Citations omitted.)

We do not think the new business rule applies in the present case because CBS is an established business with a prior record of repairing DEC equipment. Additionally, we do not equate the estimates in the present case to those found wanting in *ADC Fairways*. Raymond's estimates, unlike those in *ADC Fairways*, were based upon and supported by underlying revenue and cost records of similar business undertakings. Thus, the evidence would have afforded a jury a sufficient basis for estimating the damages with reasonable certainty.

We conclude, therefore, that CBS's evidence of lost profits was not speculative as a matter of law.

## VII

In sum, we hold that the trial court erred in granting summary judgment in favor of BellSouth. Accordingly, the trial court's

judgment will be reversed and the case remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

JUSTICE WHITING, with whom CHIEF JUSTICE CARRICO joins, dissenting.

While there are several reasons for my dissent, I focus upon only two. First, I do not think that the majority has correctly applied the test for vicarious liability in cases of this kind. In distinguishing *Davis v. Merrill*, 133 Va. 69, 77-78, 112 S.E. 628, 631 (1922), and *Tri-State Coach Corp. v. Walsh*, 188 Va. 299, 305, 49 S.E.2d 363, 366 (1948), the employee-assault cases relied upon by the majority, we indicated that the test was whether the tortious act

> (1) was an act fairly and naturally incident to the business of the employer, and (2) was . . . done with a view to further the master's interest or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise from some external, independent and personal motive on the part of the servant to do the act upon his own account.

*Cary v. Hotel Rueger, Inc.*, 195 Va. 980, 984, 81 S.E.2d 421, 423 (1954) (citing *Tri-State Coach Corp.*).

In *Davis* and *Tri-State Coach Corp.*, described in detail in the majority opinion, the agents' acts incident to their principals' business were motivated by aberrant impulses or emotions which grew out of that business. However, in *Cary*, another employee-assault case, we held that there was no vicarious liability because the employee's act "arose from an independent and personal motive on the part of [the agent] to do the act upon his own account." 195 Va. at 987, 81 S.E.2d at 424.

In *Cary*, a hotel bellman shot a hotel guest during an argument over a debt the bellman owed the guest when the guest prevented the bellman from leaving a hotel elevator to deliver some ice to another guest. 195 Va. at 982, 81 S.E.2d at 422. We noted that the arguments in *Davis* and *Tri-State* arose from the manner in which the employee did his work, but in *Cary*, we observed that

even though "the fatal shooting took place on the hotel's elevator while [the employee] was operating it, . . . the shooting did not arise out of this service." *Id.* at 986-87, 81 S.E.2d at 424.

The majority notes correctly that Waldrop's "motive was personal—to advance his self-interest, rather than the interest of BellSouth." Yet the majority makes BellSouth responsible for his act.

Applying the standards articulated in *Cary*, I conclude that BellSouth is not liable for Waldrop's tort because: (1) Waldrop's alleged acceptance of a bribe in return for negotiating a contract unfavorable to BellSouth was not an act fairly and naturally incident to his duties for BellSouth; (2) the act was not done with a view to further BellSouth's interest; (3) the act did not arise from some impulse or emotion which naturally grew out of BellSouth's business, nor was it incidental to his attempt to perform BellSouth's business; and (4) Waldrop's tort arose from his "external, independent and personal motive" of greed in taking a bribe in return for the award of a contract disadvantageous to BellSouth.

In my opinion, Waldrop's fraudulent act was no more within the scope of his employment than was the act of the bellman in *Cary*. Thus, I do not agree that Waldrop's tortious act bound BellSouth.

My second reason for dissenting is that I do not think CBS can do indirectly what it could not have done directly. In my opinion, BellSouth would not have been liable to CBS if it had refused to renew CBS's contract for no reason at all, or for an improper reason not contrary to a clearly articulated public policy. *Miller v. SEVAMP, Inc.*, 234 Va. 462, 465, 362 S.E.2d 915, 916-17 (1987) (at-will employment contract may be terminated by either party "for any reason, or for no reason").

We apply two "narrow" exceptions to termination rights of at-will employment contracts. Each is based on public policy articulated in statutory provisions. *See Lockhart v. Commonwealth Educ. Sys.*, 247 Va. 98, 102, 439 S.E.2d 328, 330 (1994) (racially motivated discharge of at-will employee); *Bowman v. State Bank of Keysville*, 229 Va. 534, 539-40, 331 S.E.2d 797, 801 (1985) (retaliatory discharge of at-will employees for exercise of their stockholder-voting rights).* Since such a contract can be termi-

---

* Examples of the application of these and other narrow exceptions by other jurisdictions are cited in *Bowman*, 229 Va. at 539-40, 331 S.E.2d at 800-801, and Michael A.

nated for no reason, at least one jurisdiction holds that there is no liability for termination for improper reasons. *Salter v. Alfa Ins. Co.*, 561 So. 2d 1050, 1054 (Ala. 1990).

Here, we are dealing with a claim of an allegedly improper refusal to renew a contract rather than an allegedly improper termination of an at-will contract. However, the same principles apply in both instances. *See Glass v. Glass*, 228 Va. 39, 51-52, 321 S.E.2d 69, 76-77 (1984); FOWLER V. HARPER, ET AL., THE LAW OF TORTS § 6.13, at 360 (2d ed. 1986); W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 129, at 987 (5th ed. 1984 & Supp. 1988) (causes of action for interference with prospective and at-will contracts analogized). And the majority articulates no public policy imposing a direct liability upon BellSouth even if it had refused to renew CBS's contract for no reason at all or for an improper reason.

I conclude that no public policy is served by imposing a vicarious liability upon an innocent principal for its agent's independent tort in advancing his own interests at the principal's expense. Accordingly, I would affirm the court's judgment for BellSouth.

DiSabatino, Annotation, *Modern Status of Rule that Employer May Discharge At-will Employee for Any Reason*, 12 A.L.R.4th 544 (1982 & Supp. 1993).