DECISION AND JOURNAL ENTRY.
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, The May Department Stores (d.b.a. Kaufmann's Department Store), appeals the decision of the Summit County Court of Common Pleas. We affirm.
On April 18, 1998, at approximately 4:00 p.m., Ebonnie Davis, who was then fourteen years old, went shopping with her friend, Resheena Isaiah, at Kaufmann's Department Store ("Kaufmann's"), located in Rolling Acres Mall in the City of Akron, County of Summit, State of Ohio. When Ms. Davis and Ms. Isaiah entered Kaufmann's, they split up and began to shop separately. This behavior drew the attention of Todd Hedderly, Kaufmann's loss prevention manager, who was surveilling the store via closed-circuit television ("CCTV"). Ms. Davis and Ms. Isaiah's behavior attracted Mr. Hedderly's attention because behavior involving "pairs who separate either prior to or as they enter a selling area" may indicate a potential shoplifting situation, according to the Kaufmann's security manual.
While observing Ms. Davis via CCTV, Mr. Hedderly noticed that Ms. Davis took a large number of clothing items and appeared to select some of these items without regard to size, price, or to matching them with other items. Apparently, this type of behavior is another indicator of potential shoplifting. Mr. Hedderly continued to observe Ms. Davis as she spoke with a salesclerk and entered a fitting room. Ms. Davis exited the fitting room a couple of times dressed in outfits, which she had selected, and again spoke with the salesclerk. A videotape of Mr. Hedderly's CCTV surveillance was played for the jury and admitted into evidence. The surveillance tape revealed that, at one point, Ms. Davis was speaking with the salesclerk and walking around the sales floor in her socks. When Ms. Isaiah eventually rejoined Ms. Davis, Ms. Davis modeled some of the outfits for her friend and sought her opinion as to the clothes. Then, Ms. Davis changed into her own clothes. Ms. Davis put some of the clothes, which she had taken into the fitting room, on a rack near the fitting room and requested that the salesclerk hold some items for her because she might buy them later that day. Ms. Davis gave her name to the salesclerk and left Kaufmann's with her friend.
As the CCTV did not have audio capabilities, Mr. Hedderly could only see the interactions between Ms. Davis and others, but could not hear their conversations. Consequently, Mr. Hedderly only saw Ms. Davis exit the fitting room in her own clothes and speak with the salesclerk a final time. He was unaware of the content of the conversation. When Ms. Davis exited the fitting room, Mr. Hedderly thought that Ms. Davis had not removed from the fitting room all of the clothing with which she had entered. One of these allegedly missing items was a pair of green shorts. Accordingly, Mr. Hedderly hurried to check the fitting room to see if the items had been left there and asked James Greathouse, a loss prevention agent for Kaufmann's, to continue the constant surveillance of the fitting room and Ms. Davis, pursuant to Kaufmann's procedure. At some point during the CCTV surveillance, Mr. Hedderly and/or Mr. Greathouse were distracted from their surveillance and did not notice a salesclerk remove the allegedly missing items from the fitting room used by Ms. Davis. Consequently, when Mr. Hedderly discovered only a designer tag, a hanger, and a piece of tissue paper in the fitting room, he believed that Ms. Davis had absconded with Kaufmann's merchandise. Neither of the agents questioned the salesclerks on the floor to determine whether they had re-racked the merchandise, before detaining Ms. Davis.
Believing Ms. Davis to be shoplifting, Mr. Hedderly and Mr. Greathouse pursued Ms. Davis to the Hallmark store, which was located adjacent to Kaufmann's. The two non-uniformed, male agents approached Ms. Davis, who was standing alone outside of the Hallmark store waiting for her friend. Mr. Hedderly introduced himself as Kaufmann's security. According to Mr. Hedderly and Mr. Greathouse, they requested that Ms. Davis return to Kaufmann's with them because they wanted to recover some missing merchandise. They testified that Ms. Davis was very compliant. Conversely, Ms. Davis related that she was instructed to return to Kaufmann's by Mr. Hedderly and did not feel that she had any choice but to accompany them back to Kaufmann's; however, she admitted that she wanted to clear up any misunderstanding regarding whether she had stolen the Kaufmann's merchandise. While escorting Ms. Davis back to Kaufmann's security office, Mr. Hedderly stood in front of Ms. Davis and Mr. Greathouse stood behind her. Neither agent asked Ms. Davis her name, age, or location of her parents.
According to Ms. Davis, when the three individuals arrived in the security office, Mr. Hedderly ordered her to sit down, closed the door, and stressed that he needed to recover the missing merchandise. Mr. Hedderly stated that he merely offered her a seat and kept the door open because there were no other females present. Ms. Davis repeatedly denied having stolen any merchandise. Despite these denials, Mr. Hedderly continued to question her about the missing clothing. Ms. Davis described Mr. Hedderly's voice as stern but not loud. Ms. Davis told the agents that she put the items back on the rack or left them in the fitting room. In response, Mr. Hedderly said, "Show me where you put it."[1] At that point, Ms. Davis and Mr. Hedderly went to the sales floor so that Ms. Davis could show him where she had left the missing items. Ms. Davis testified that Mr. Hedderly continued to question her in front of other shoppers, which caused her embarrassment. When the items were not located, they returned to the security office and rejoined Mr. Greathouse.
Ms. Davis testified that when they returned to the security office, Mr. Hedderly requested, via a walkie-talkie, that a female officer report to the Kaufmann's security office and that Mr. Hedderly and Mr. Greathouse stood in the doorway, while waiting for Kathryn Smith, a Pinkerton's security officer, to arrive. Conversely, Mr. Hedderly testified that he requested a female officer when he first detained Ms. Davis, because Kaufmann's required a female witness to be present when a female suspect is being questioned.
When Ms. Smith arrived in the security office, she was dressed in uniform and wore a badge. She testified that Mr. Hedderly had informed her that he needed a female security officer because he had detained a female who was suspected of stealing merchandise. Mr. Greathouse testified that Mr. Hedderly informed Ms. Smith that they had a juvenile female shoplifter, who claimed not to have any merchandise. According to Ms. Smith, Mr. Greathouse told her that Ms. Davis had a pair of green shorts "right here" and patted his stomach area. Mr. Hedderly and Mr. Greathouse then left the room, shutting the door behind them. Mr. Hedderly explained that he left the two females alone in the room because he thought Ms. Davis would more readily confess and return the missing goods to another female.
Based on the foregoing, Ms. Smith believed that the Kaufmann's agents wanted her to have Ms. Davis open her clothing to ascertain whether Ms. Davis was, in fact, concealing the green shorts under her street clothes. Ms. Smith conceded, however, that the Kaufmann's agents did not explicitly request a strip-search of Ms. Davis. Further, Mr. Hedderly vehemently denied knowing that Ms. Smith was going to perform a strip-search of Ms. Davis. Counsel for Ms. Davis attempted to impeach Mr. Hedderly with a report, which Mr. Hedderly had completed shortly after the incident. Mr. Hedderly was asked whether he had written in that report that he and Mr. Greathouse left the office only after Ms. Smith patted Ms. Davis down and asked her to lift up her shirt. Mr. Hedderly admitted to writing the report, but denied that he witnessed Ms. Smith pat down Ms. Davis and request that she lift her shirt before leaving the office.
During the search, Ms. Smith told Ms. Davis to lift her shirt and lower her pants. Ms. Davis complied and lifted her shirt exposing the bottom of her bra and pulled down her pants. Ms. Davis claimed, and Ms. Smith denied, that Ms. Smith had told Ms. Davis to turn around in her state of undress and that Ms. Smith physically pulled up Ms. Davis' shirt from behind. Ms. Smith testified that while Ms. Davis never verbally consented to the search, she assented to all of her requests. Ms. Davis, on the other hand, stated that she thought Ms. Smith might have been a police officer due to her uniform and badge and that Ms. Smith demanded and instructed her to open her clothing. Ms. Davis further related that no one informed her that she was free to leave at any time and did not have to submit to the strip-search.
Upon completing the strip-search, Ms. Smith opened the door and informed the Kaufmann's agents that Ms. Davis was "clean," meaning that she was not concealing any stolen merchandise. Ms. Smith stated that she was not asked by the agents to remain in the office as a female witness, while they continued to question Ms. Davis, so she left. Mr. Hedderly admitted to being surprised that Ms. Davis did not have the garments hidden beneath her clothing. Nevertheless, he persisted in asking Ms. Davis whether she gave the missing clothing to her friend. At that point, Ms. Davis became angry, yelled at Mr. Hedderly, and asked permission to leave. Mr. Hedderly permitted her to do so. At no time during the incident did Mr. Hedderly attempt to contact Ms. Davis' mother, and at no time did Ms. Davis request that her mother be contacted.
Witnesses testified that immediately after the incident, Ms. Davis was sobbing hysterically. As a result of the incident, Ms. Davis suffered extreme embarrassment and humiliation. Additionally, Dr. Dawn Lord testified that Ms. Davis experienced depression and posttraumatic stress disorder after the incident. Ms. Davis' mother also related that her daughter had begun vomiting and hiding the vomit in plastic bags and had begun taking weight loss supplements. Although Ms. Davis was self-conscious about her weight prior to the incident, witnesses related that, after the incident, these concerns intensified.
As previously mentioned, Kaufmann's set forth certain guidelines for the apprehension of shoplifters in various scenarios, including fitting room cases. These guidelines provided in part that "[t]he arrest of a subject for shoplifting based on activity conducted in the fitting room is a situation that must be handled with strict adherence to arrest guidelines." Mr. Hedderly acknowledged that strip-searching a suspected shoplifter is expressly forbidden by Kaufmann's. Admittedly, Mr. Hedderly and Mr. Greathouse did not follow some of Kaufmann's guidelines when they detained Ms. Davis. As a result of the incident, a performance warning was placed in Mr. Hedderly's permanent employment file, and his supervisor discussed the matter with him. The performance warning stated, in part: "WHAT CAN THE ASSOCIATE DO TO HELP ENSURE FUTURE COMPLIANCE WITH POLICY, PROCEDURE, OR PROGRAM? * * * REQUEST RE-TRAINING FROM YOUR SUPERVISOR[.]" Mr. Hedderly stated that he has not sought retraining as of the date of trial, which was approximately two years after the incident.
Ms. Davis and her mother, Sandra McCloude, filed a complaint in the Summit County Court of Common Pleas, naming as defendants The May Department Stores (d.b.a. Kaufmann's Department Store), Todd Hedderly, Pinkerton's, Inc. (d.b.a. Pinkerton Security and Investigation Services), and Kathryn Smith. Ms. Davis and Ms. McCloude asserted numerous claims against the defendants; however, only Ms. Davis' claims for false imprisonment, civil assault, battery, and punitive damages were submitted to the jury, as the trial court disposed of plaintiffs' other claims accordingly. A jury trial was held, commencing on September 26, 2000. At the close of all evidence, Kaufmann's moved for a directed verdict as to Ms. Davis' claims of false imprisonment, battery, and assault and moved to dismiss the punitive damages claim. The motions for a directed verdict and to dismiss the punitive damages claim were denied, and the claims were submitted to the jury.
On September 30, 2000, the jury announced its verdict, finding in favor of Ms. Davis on the false imprisonment[2] claim against Kaufmann's and awarded her damages in the amount of $212,000, which consisted of $12,000 in compensatory damages and $200,000 in punitive damages. On the remaining claims, the jury found in favor of the defendants. Subsequently, Kaufmann's moved for judgment notwithstanding the verdict. Ms. Davis responded in opposition. On December 11, 2000, the trial court denied Kaufmann's motion for judgment notwithstanding the verdict and entered judgment on the jury's verdict. The trial court also awarded Ms. Davis attorney's fees in the amount of $55,272.50. This appeal followed.
 II.
Appellant asserts three assignments of error. We will discuss each in due course, consolidating the first and second assignments of error to facilitate review.
 A. First Assignment of Error THE TRIAL COURT ERRED BY FAILING TO DIRECT A VERDICT OR GRANT JUDGMENT NOTWITHSTANDING THE VERDICT ON KAUFMANN'S PUNITIVE DAMAGES CLAIM WHERE KAUFMANN'S MAINTAINS POLICIES DESIGNED TO MINIMIZE THE RISK OF FALSE IMPRISONMENT AND APPELLEES ADDUCED NO EVIDENCE OF KAUFMANN'S MALICE OR ILL WILL.
 Second Assignment of Error THE TRIAL COURT ERRED BY FAILING TO DIRECT A VERDICT OR GRANT JUDGMENT NOTWITHSTANDING THE VERDICT ON PLAINTIFFS' FALSE [I]MPRISONMENT CLAIM WHERE KAUFMANN'S EMPLOYEES POSSESSED PROBABLE CAUSE TO DETAIN MS. DAVIS EVEN IF IT WAS LATER DISCERNED THAT THE EMPLOYEES WERE MISTAKEN.
In its first and second assignments of error, Kaufmann's avers that the trial court erred when it failed to grant Kaufmann's motions for directed verdict and judgment notwithstanding the verdict on Ms. Davis' claims of false imprisonment and punitive damages. We disagree.
 Standard of Review
Civ.R. 50(A)(4) provides that when a party moves for a directed verdict,
 and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.
Upon review, this court must determine whether the evidence was such that reasonable minds could only find in favor of the moving party on the issue. Helmick v. Republic-Franklin Ins. Co. (1988), 39 Ohio St.3d 71,74-75.
The standard of review for a motion for judgment notwithstanding the verdict is the same as that applicable to a motion for directed verdict.Posin v. A.B.C. Motor Court Hotel, Inc. (1976), 45 Ohio St.2d 271, 275.
 Punitive Damages Claim
Kaufmann's contends that the trial court erred in denying Kaufmann's motions for directed verdict and judgment notwithstanding the verdict regarding Ms. Davis' punitive damages claim. Specifically, Kaufmann's claims that the punitive damages award was improper because Kaufmann's security manual prohibited the employees' conduct, and therefore, Kaufmann's could not be liable for punitive damages absent ratification, which, according to Kaufmann's, Ms. Davis failed to prove. Essentially, Kaufmann's asserts that Ms. Davis failed to adduce evidence showing that Kaufmann's authorized, ratified, or participated in the employees' conduct. Additionally, Kaufmann's avers that Ms. Davis failed to present evidence of actual malice by Kauffmann's employees, thereby making the punitive damages award improper. We disagree.
R.C. 2315.21 governs the recovery of punitive and exemplary damages in tort actions. For a plaintiff to recover punitive damages in a tort action, the plaintiff must show by clear and convincing evidence that "[t]he actions or omissions of [the] defendant demonstrate malice, aggravated or egregious fraud, oppression, or insult, or that defendant as principal or master authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate[.]" R.C.2315.21(B)(1) and (C)(3). Actual malice for the purpose of awarding punitive damages is "`(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or
(2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" (Emphasis original.) Calmes v. Goodyear Tire Rubber Co. (1991), 61 Ohio St.3d 470,473.
Kaufmann's initially argues that Ms. Davis failed to prove by clear and convincing evidence that the conduct of the employees demonstrated malice. Construing the evidence most strongly in favor of Ms. Davis, as this court must do in reviewing a motion for a directed verdict, a reasonable jury could have found that Mr. Hedderly and Mr. Greathouse chose to detain Ms. Davis for shoplifting, despite failing to maintain constant CCTV surveillance of the fitting room area and without verifying whether salesclerks had removed the missing merchandise from the fitting room. Moreover, these agents repeatedly questioned a minor child of the opposite sex and accused her of shoplifting without ever asking for preliminary information such as her name and age and without contacting her parents. Some of the questioning took place in front of the general public on the sales floor, which was embarrassing to Ms. Davis. Furthermore, viewing the evidence most strongly in favor of Ms. Davis, a reasonable jury could have found that Mr. Hedderly and Mr. Greathouse had implicitly requested that Ms. Smith conduct a strip-search of Ms. Davis, when they summoned a female security officer, told Ms. Smith that they had a suspected female shoplifter who was concealing evidence, informed Ms. Smith that the suspect had hidden the shorts "right here," while patting the stomach area, and then left the room shutting the door behind them. Even after being informed that Ms. Davis had not concealed the garments beneath her street clothes, Mr. Hedderly continued to accuse Ms. Davis of shoplifting by inquiring whether she had given the clothing to her friend. Based on the foregoing, we conclude that a reasonable jury could find that the agent/employees' actions demonstrated a conscious disregard for the rights of Ms. Davis that had great probability of causing substantial harm, and therefore, their actions demonstrated malice, oppression, or insult.
Next, Kaufmann's argues that Ms. Davis failed to prove that Kaufmann's authorized, participated in, or ratified the actions of its employees, and therefore, Kaufmann's could not be held liable for punitive damages. As previously mentioned, an employer is not liable for punitive damages unless the employer authorized, participated in, or ratified the actions of the employee. R.C. 2315.21(B)(1). "Generally, acts committed within the scope of employment will be authorized, either expressly or impliedly, by the employer." Fulwiler v. Schneider (1995),104 Ohio App.3d 398, 406. In that situation, the doctrine of respondeatsuperior applies. Id. Regarding respondeat superior, the Ohio Supreme Court has written:
 It is well-established that in order for an employer to be liable under the doctrine of respondeat superior, the tort of the employee must be committed within the scope of employment. Moreover, where the tort is intentional, * * * the behavior giving rise to the tort must be "calculated to facilitate or promote the business for which the servant was employed * * *."
Byrd v. Faber (1991), 57 Ohio St.3d 56, 58. Significantly, "[t]he willful and malicious character of an employee's act does not always, as a matter of law, remove the act from the scope of employment." Osborne v. Lyles
(1992), 63 Ohio St.3d 326, 330. "`When an employee diverts from the straight and narrow performance of his task, the diversion is not an abandonment of his responsibility and service to his employer unless his act is so divergent that its very character severs the relationship of employer and employee. * * *'" (Alterations original.) Id., quotingStranahan Bros. Catering Co. v. Coit (1896), 55 Ohio St. 398, 410. Furthermore, the determination of "whether an employee is acting within the scope of his employment is [generally] a question of fact to be decided by the jury." Osborne, 63 Ohio St.3d at 330. It only becomes a question of law when reasonable minds can come to but one conclusion.Id.
If an employee's act is outside the scope of employment, however, the plaintiff must demonstrate that the defendant-employer ratified the willful and malicious conduct by the employee. Fulwiler,104 Ohio App.3d at 406. Ratification generally occurs when the employer with full knowledge of the facts, acts in a manner that manifests an intention to approve the unauthorized act of the agent-employee. See Bailey v.Midwestern Ent., Inc. (1995), 103 Ohio App.3d 181, 185; Williams v. HyattLegal Serv. (Mar. 14, 1990), Summit App. No. 14235, unreported, at 4. Even slight acts of ratification will be sufficient to support a claim for punitive damages against an employer. Saberton v. Greenwald (1946),146 Ohio St. 414, 430; Williams, supra, at 4.
In the present case, Kaufmann's contends that it should not be held liable for punitive damages when its employee failed to follow routinely enforced procedures set forth by Kaufmann's; essentially, Kaufmann's is asserting that the agents' failure to comply with Kaufmann's guidelines renders their conduct outside the scope of employment. To be sure, manuals of instructions to employees or an employer's guidelines constitute some evidence tending to show that an employee was either acting outside or within the scope of employment, depending on the circumstances of each case. See Martin v. Cavalier Hotel Corp. (C.A.4, 1995), 48 F.3d 1343, 1351-52; Commercial Business Systems, Inc. v.Bellsouth Serv., Inc. (1995), 249 Va. 39, 46; Curry v. Giant Food Co. (App.D.C. 1987), 522 A.2d 1283, 1289. Contrary to Kaufmann's assertion, however, an employee's noncompliance with his or her employer's manual or guidelines is not an absolute shield from liability for the employer and is not wholly dispositive of the issue regarding whether the employee was acting outside the scope of employment.
Here, Ms. Davis adduced evidence tending to show that Mr. Hedderly and Mr. Greathouse were acting within the scope of their employment. For instance, there was evidence that Mr. Hedderly and Mr. Greathouse were employed by Kaufmann's, were on-duty at the time of the incident, and were surveilling the shopping area for shoplifters. Moreover, Mr. Hedderly acknowledged that he detained Ms. Davis to ascertain whether she had stolen certain items from the store. Similarly, Ms. Smith, who was summoned by Mr. Hedderly, testified that she was acting on behalf of Kaufmann's and was attempting to ascertain whether Ms. Davis had hidden stolen items underneath her clothing, when she searched Ms. Davis. By preventing losses caused by shoplifting, the agent/employees' conduct was clearly designed to promote and facilitate Kaufmann's business. SeeTucker v. Kroger Co. (1999), 133 Ohio App.3d 140, 148. Consequently, we conclude that, viewing the evidence in a light most favorable to Ms. Davis, a reasonable jury could find that Ms. Smith, Mr. Greathouse, and Mr. Hedderly were acting within the scope of their employment and/or as agents for Kaufmann's and were acting to promote and facilitate Kaufmann's business when they detained and searched Ms. Davis; therefore, the jury could have reasonably determined that Kaufmann's had either explicitly or implicitly authorized the conduct, thereby subjecting Kaufmann's to liability for punitive damages.
Assuming arguendo that Mr. Hedderly was acting outside the scope of his employment, we find that a reasonable jury could find that Kaufmann's ratified Mr. Hedderly's conduct. Ms. Davis presented evidence that, despite the reprehensible nature of the incident, Kaufmann's merely placed a written reprimand in Mr. Hedderly's permanent employment file and discussed it with him. Moreover, although the reprimand specified that Mr. Hedderly should undergo retraining from his supervisor to ensure that such incidents would not occur in the future, Mr. Hedderly never sought retraining and Kaufmann's did not pursue that avenue of reducing the chance that such an incident would occur in the future.
Based on the foregoing, we hold that construing the evidence in a light most favorable to Ms. Davis, a reasonable jury could conclude that Kaufmann's authorized or ratified the agent/employees' conduct and that the agent/employees' actions demonstrated malice, oppression, or insult; therefore, we conclude that the trial court appropriately denied Kaufmann's motions for directed verdict and judgment notwithstanding the verdict regarding Ms. Davis' punitive damages claim. Accordingly, Kaufmann's first assignment of error is overruled.
 False Imprisonment Claim
Kaufmann's avers that, regarding Ms. Davis' false imprisonment claim, the trial court erred in denying Kaufmann's motions for directed verdict and judgment notwithstanding the verdict for the following reasons: 1) Kaufmann's employees had probable cause to detain Ms. Davis, 2) Ms. Davis voluntarily complied with the agent/employees' requests, and 3) the employees were allowed to detain Ms. Davis under R.C. 2935.041. We disagree.
This court has held that "[t]o be liable for false imprisonment the defendant must have intentionally confined the plaintiff within a limited area, for any appreciable time, without lawful privilege or the plaintiff's consent." Witcher v. Fairlawn (1996), 113 Ohio App.3d 214,217, citing Feliciano v. Kreiger (1977), 50 Ohio St.2d 69, 71. "Confinement consists of a `total detention or restraint upon [the plaintiff's] freedom of locomotion, imposed by force or threats.'" (Citation omitted and alterations original.) Witcher,113 Ohio App.3d at 217.
Ohio's shopkeeper's privilege, R.C. 2935.041, provides in part:
 [a] merchant, or his employee or agent, who has probable cause to believe that items offered for sale by a mercantile establishment have been unlawfully taken by a person, may * * * detain the person in a reasonable manner for a reasonable length of time within the mercantile establishment or its immediate vicinity.
R.C. 2935.041(A). One of the permissible purposes for such a detention is "[t]o recover the property that is the subject of the unlawful taking, criminal mischief, or theft[.]" R.C. 2935.041(C)(1). However, a merchant or his employee "shall not search the person, search or seize any property belonging to the person detained without the person's consent, or use undue restraint upon the person detained." R.C. 2935.041(D).
Generally, R.C. 2935.041 "permits merchants to detain a person for a reasonable length of time in a reasonable manner if the merchant has probable cause to believe that the person has unlawfully taken an item."Tucker, 133 Ohio App.3d at 147. Whether a detention is unreasonable is generally a question of fact for the jury to decide based upon the particular facts and circumstances of the case. Hodges v. Meijer, Inc. (1998), 129 Ohio App.3d 318, 324. If a detention is unreasonable, the merchant or his employee may be liable for false imprisonment.
As previously discussed at length above, Mr. Hedderly and Mr. Greathouse believed that they had probable cause to detain Ms. Davis because she left the fitting room with fewer than all of the garments with which she had entered, and Mr. Hedderly found an empty fitting room upon inspection. However, evidence adduced at trial showed that the agents did not ask the salesclerks whether they had removed the items from the fitting room after Ms. Davis' departure and that the agents did not maintain constant CCTV surveillance of the fitting room, as a salesclerk did, in fact, remove and re-rack the allegedly missing items. Assuming, however, that the agents had probable cause to detain Ms. Davis under R.C. 2935.041, the length and manner of the detention must still be reasonable. See Tucker, 133 Ohio App.3d at 147. Additionally, Ms. Davis cannot have consented to the detention and search for Kaufmann's to be held liable for false imprisonment. See Witcher, 113 Ohio App.3d at 217. Construing the evidence most strongly in Ms. Davis' favor, a reasonable jury could find that Ms. Davis had not consented to the detention and search and that the manner in which the search was conducted was unreasonable. Here, Ms. Davis, who was only fourteen years old, was approached by two older male security guards. Ms. Davis testified that they instructed her to return to Kaufmann's with them and that one agent walked in front of her and the other walked behind her while they escorted her to the security office. Ms. Davis further related that at certain points, either one or both of the agents stood in front of the exit from the office. She testified that she was interrogated by the agents, and that when the missing garments could not be located, she was strip-searched by Ms. Smith. Although Ms. Davis did not request to leave until the very end (and was immediately permitted to do so) and assented to the agents requests, no one informed her that she could leave at any time and could refuse to submit to the search. Furthermore, neither of the agents contacted her mother during the incident. Ms. Davis repeatedly testified that she did not feel that she was free to leave, as the agents were authority figures. We conclude that a reasonable jury could find that Ms. Davis had proven all of the elements of a false imprisonment claim. Accordingly, Kaufmann's second assignment of error is overruled.
 B. Third Assignment of Error THE JURY VERDICT IN FAVOR OF PLAINTIFFS AND AGAINST KAUFMANN'S ON THE ISSUES OF PUNITIVE DAMAGES AND FALSE IMPRISONMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
In its third assignment of error, Kaufmann's argues that the jury's verdict on the claims of false imprisonment and punitive damages was against the manifest weight of the evidence. We disagree.
When the manifest weight of the evidence is challenged, "[a]n appellate court conducts the same manifest weight analysis in both criminal and civil cases." Ray v. Vansickle (Oct. 14, 1998), Lorain App. Nos. 97CA006897 and 97CA006907, unreported, at 3.
 "The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v. Cincinnati (1988),38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment." Id.
In the present case, the jury had the opportunity to hear the conflicting testimony, view the witnesses, and adjudge the witnesses' credibility; therefore, we must give the jury's determination deference. See State v. Lawrence (Dec. 1, 1999), Lorain App. No. 98CA007118, unreported, at 13. After a thorough review of the record, we conclude that the jury did not act against the manifest weight of the evidence and commit a manifest miscarriage of justice in holding Kaufmann's liable for false imprisonment and in awarding punitive damages to Ms. Davis. Accordingly, Kaufmann's third assignment of error is overruled.
 III.
Appellant's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
BAIRD, J., CARR, J. CONCUR.
[1] Mr. Hedderly stated that he merely gave her the opportunity to show him where she put the missing items.
[2] Throughout the proceedings, the terms false arrest and false imprisonment were used interchangeably. We note that false arrest includes false imprisonment. Tucker v. Kroger Co. (1999),133 Ohio App.3d 140, 146. As the jury was specifically instructed on the elements of false imprisonment, we will refer to this claim as one for false imprisonment.