**Edwina WEBB, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. CIV.A. 97–0283–B.

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

Nov. 3, 1998.

care for her child and had received permission to     be absent.

Timothy Worth McAfee, Bledsoe & McAfee, P.C., Big Stone Gap, VA, for Plaintiff.

John F. Corcoran, U.S. Attorney's Office, Roanoke, VA, for U.S., Zubair Latif, Dr.

## OPINION AND ORDER

JONES, District Judge.

The question in this case is whether sexual battery on a patient by a government doctor

falls within the scope of the doctor's employment under the Federal Tort Claims Act. Applying Virginia employment law to the particular facts of this case, I find that the doctor was not acting within the scope of his employment.

## I. Background.

On December 1, 1997, Edwina Webb filed a complaint against the United States in this court under the Federal Tort Claims Act, 28 U.S.C.A. §§ 2671–2680 (West 1994) ("FTCA"), and the Federally Supported Health Centers Assistance Act, 42 U.S.C.A. § 233 (West 1991) ("FSHCAA"). Webb asserts that on December 10 and December 13, 1996, while she was receiving medical treatment from Stone Mountain Health Services, a health center receiving assistance under the FSHCAA, Zubair Latif, M.D., an employee of the center, committed sexual battery on her, for which she seeks damages.

On December 2, 1998, the United States filed a motion to dismiss, asserting that the FTCA provides only a limited waiver of sovereign immunity and that assault and battery is specifically excluded from the statute. In response, Webb moved to amend the complaint to add Dr. Latif as an individual defendant. On February 20, 1998, Webb's motion was granted and subsequently Webb filed an amended complaint, naming Dr. Latif individually, as well as the United States, as defendants.

On March 13, 1998, pursuant to the Federal Employees Liability and Reform Tort Compensation Act of 1988, 28 U.S.C.A. § 2679(d) (West 1994) (the "Westfall Act"[1]), the United States Attorney for the Western District of Virginia certified that Dr. Latif was acting within the scope of his employment as an employee of a federally-assisted community health center as defined in the FSHCAA. 42 U.S.C.A. § 233(g)-(n). Pursuant to the Westfall Act, the United States also filed a notice substituting the United States as defendant, precluding suit against Dr. Latif by Webb. The United States then renewed its motion to dismiss, again contending that the FTCA specifically excludes the intentional tort alleged.

On April 2, 1998, Webb filed a memorandum in opposition to the United States' motion to dismiss. Webb contends that the United States Attorney's certification, and the resulting substitution of the United States for Dr. Latif, are invalid because Dr. Latif's actions did not occur within the scope of his employment.

By opinion dated May 11, 1998, I found that a genuine issue of material fact existed as to whether Dr. Latif acted within the scope of his employment under applicable law. The parties were ordered to engage in discovery limited to the scope-of-employment issue, with an evidentiary hearing to follow. Decision on the government's motion to dismiss was deferred while the validity of its scope-of-employment certification was determined. Likewise, the plaintiff's subsequent motion for leave to amend her complaint to sound in negligence, thus avoiding the intentional torts exclusion under the FTCA, was also deferred pending the results of the evidentiary hearing.

The evidentiary hearing on scope of employment was held on September 8, 1998, and the issues are now ripe for decision.

## II. Facts.

The following are my findings of fact, based on the evidence presented at the hearing.

1. On December 10, 1996, Edwina Webb went to the St. Charles Clinic, a medical facility operated by Stone Mountain Health Services, in Pennington Gap, Virginia, on a regular, scheduled visit for treatment of her panic disorder illness.

2. During her regular monthly appointments at the St. Charles Clinic, Webb was examined by the clinic personnel in order to determine any necessary treatment. Depending on her condition at the time, these examinations included monitoring of her heart rate, blood pressure, and lungs; blood work; and consultations concerning her prescription medications.

---

**1.** So-called because in part it abrogated the Supreme Court's holding in *Westfall v. Erwin*, 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988).

3. When Webb arrived at the clinic on December 10, 1996, she was assigned to Dr. Zubair Latif, one of the staff physicians employed by Stone Mountain Health Services. The plaintiff had never seen Dr. Latif before.

4. According to Webb, Dr. Latif conducted the exam in one of the rooms at the facility, without assistance from any staff nurses, and he and Webb were alone.

5. Webb alleges that she informed Dr. Latif of her panic disorder and also indicated that she was having some problems with a previous spontaneous pneumothorax.[2] Dr. Latif appeared to have Webb's medical history with him for his consultation.

6. At this point, Webb alleges that Dr. Latif had the plaintiff lie back on an examination table. He then began by lifting up Webb's shirt and bra and feeling her breasts. This occurred despite the plaintiff's comment that she had received a breast examination only a week before. Webb alleges that she thought something might be wrong and asked Dr. Latif what he was doing. Dr. Latif, however, did not respond. No covering towel was provided, as Webb alleges was customary for breast examinations at the clinic, nor was another staff member present, as had always been the practice at the clinic for breast exams. Dr. Latif continued in this way for a minute or two, feeling the plaintiff's breasts and staring at them. Webb alleges that the exam was unlike any she has had in her experience. She is now thirty-four-years old, and has had regular breast exams since age fourteen.

7. Webb alleges that at some point while she was on the examination table, Dr. Latif had her pull her pants down, leaving only her panties on. He then allegedly conducted an examination of Webb's legs, buttocks, breasts and neck, with a medical instrument unfamiliar to Webb. According to Webb, Dr. Latif asked her to turn to her left side, and then, without her having asked for his assistance, grabbed her by the waist and hips and turned her himself.

8. Webb next alleges that she left the exam room for X rays of her chest (ostensibly to check her pneumothorax), and then returned with the films as Dr. Latif had instructed. No nurse was present upon her return.

9. Webb alleges that she assumed a seated position in an examination room chair, next to the doctor's desk. According to Webb, Dr. Latif then pushed a stool in front of her and sat down. At this point, Webb alleges that Dr. Latif renewed his improper contact with her: "[he] kept trying to pry my legs apart with his hands, and I didn't know what to think about it, and he kept pushing my face up by my chin telling me to look at him, look at him, because he was standing right in front of me.... His pelvic area was right in front of my face." (Tr. at 30.)[3]

10. Following this encounter, Webb alleges that the discussion with Dr. Latif turned to her medications. Despite insisting that she had been addicted to the medication Xanax, Webb alleges that Dr. Latif wrote a one-milligram-dose prescription for her, in addition to a two-milligrams-dose prescription of Klonopin.

11. Upon leaving the clinic that day, Webb alleges that she expressed her discomfort to Gail, the clinic secretary, stating that "the doctor made me very uncomfortable." (Tr. at 33.) Because she did not expect anything to happen again, however, and upon Gail's recommendation to "[s]ee how it goes next time," (Tr. at 49), the plaintiff did nothing further regarding the incident.

12. On December 13, 1996, just three days later, Webb alleges that she suffered a "severe panic attack" (Tr. at 34) which brought her back to the clinic. Dr. Latif was the only available doctor, according to Webb, and consequently the plaintiff agreed to be examined by him again.

13. As had been the case on December 10, Webb alleges that Dr. Latif was again unaccompanied by a clinic staff nurse.

2. A spontaneous pneumothorax is a collapsed lung "occurring because of the development of an abnormal opening or hole in the lung itself." 4 J.E. Schmidt, *Attorneys' Dictionary of Medicine* P–297, P–326 to P–327 (Feb.1997).

3. References are to the transcript of the evidentiary hearing.

14. According to Webb, Dr. Latif began the exam by repeating his actions of December 10, lifting up her shirt and bra and feeling her breasts. When Webb voiced her disapproval, Dr. Latif was non-responsive.

15. Webb alleges that she then got up, pulling her bra and shirt down, and retreated to the examination room chair. Dr. Latif followed her, however, and once again sat on the stool and maneuvered his way in front of the seated Webb. Dr. Latif tried to assuage Webb, grabbing her hands and face again and telling her to relax. Webb alleges that Dr. Latif kept pulling her face up to his pelvic region, grabbing her hands, and massaging her neck and back.

16. This time, Webb alleges that she "jerked away" from Dr. Latif. At this point Dr. Latif allegedly grabbed the plaintiff's breasts with both hands from behind, but Webb "jerked away" again, this time for good. (Tr. at 35.)

17. Webb claims that Dr. Latif then proposed a rendezvous at his apartment, at which time he said he would "give [her] a few hundred dollars." (Tr. 36.) According to the plaintiff, however, she did not meet with Dr. Latif. Dr. Latif also allegedly offered her an injection of Vistaril, which she refused.

18. Dr. Latif testified that he had no independent recollection of seeing Webb. (Tr. 72.) He denied Webb's account of the incidents on December 10 and 13, but admitted that "that type of conduct, if done by a physician, would not be medically appropriate," and would not "help and further the business interests of Stone Mountain Health Services." (Tr. at 71–72.) I agree, and find that, if they occurred, Dr. Latif's actions were not medically appropriate and would not further the interests of his employer.

19. The alleged acts violated Stone Mountain Health Services' "sexual harassment policy," which Dr. Latif was subject to at the time of his employment. (Tr. at 11.)

20. The alleged acts also are prohibited by the standard employment agreement signed by Dr. Latif with Stone Mountain Health Services in that they would constitute a violation of the professional standards governing physicians. (Tr. at 16, 19–20.)

21. Dr. Latif was not acting within the scope of his employment by Stone Mountain Health Services when he committed the alleged sexual battery.

### III. Analysis.

#### A. Standard for Review of Certification.

The Westfall Act amendment to the FTCA provides that:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C.A. § 2679(d)(1) (West 1994).

■■■ The Fourth Circuit has held that certification by the United States Attorney is conclusive unless challenged. *Gutierrez de Martinez v. Drug Enforcement Admin.*, 111 F.3d 1148, 1153 (4th Cir.1997) (on remand from the Supreme Court). When challenged, the certification "serves as prima evidence and shifts the burden to the plaintiff to prove, by a preponderance of the evidence, that the defendant federal employee was acting outside the scope of his employment." *Id.; see Maron v. United States*, 126 F.3d 317, 322–23 (4th Cir.1997). The plaintiff's burden at this point is then straightforward: to come forward with "specific evidence or the forecast of specific evidence that contradicts the Attorney General's certification decision, not mere conclusory allegations and speculation." *Gutierrez*, 111 F.3d at 1155; *see Wilson v. Jones*, 902 F.Supp. 673, 679 (E.D.Va.1995) (holding that if the plaintiff does not present "competent, verified evidence, including affidavits, establishing that the defendant was not acting within the scope of his employment. . . . [then] the issue is determined by the United States Attorney's certification"). In considering whether the plaintiff has, in fact, rebutted the prima facie case, the district court cannot simply

defer to the United States Attorney's certification; the scope-of-employment question under the Westfall Act is one of law and thus must be reviewed under a de novo standard. *Gutierrez*, 111 F.3d at 1152; *Vogrin v. United States*, No. 97–2117, 1998 WL 193108, at *2 (4th Cir. April 23, 1998) (unpublished) (holding that "the recent *Gutierrez* decision means that we may no longer decline to judicially decide whether substitution is proper") (citation omitted).

■ Because immunity under the FTCA "is an immunity from suit rather than a mere defense to liability," *Gutierrez*, 111 F.3d at 1154 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)), discovery and an evidentiary hearing regarding the scope-of-employment question are proper only where the pleadings, affidavits, and any supporting documentary evidence reveal an issue of material fact. *Id.* at 1154–55. At this point, the Fourth Circuit recognizes that the district court, in its discretion, may order limited discovery and an evidentiary hearing on the scope-of-employment issue. *Id.* at 1155; *see also Jamison v. Wiley*, 14 F.3d 222, 236 (4th Cir.1994) (noting that "[t]he federal courts of appeals have consistently recognized that a district court has the power to hold a limited evidentiary hearing to resolve factual disputes that bear on a scope-of-employment issue properly before it in a Westfall Act case"). Factual issues are resolved at the evidentiary hearing stage, and the district court is left to "weigh the evidence on each side to determine whether the certification should stand." *Gutierrez*, 111 F.3d at 1155.

■ When considering the evidence proffered at the evidentiary hearing, I am bound to accept as true the plaintiff's basic allegations of fact for purposes of contesting the government's scope-of-employment certification. *See Brittingham v. United States*, 972 F.Supp. 1014, 1018 (E.D.Va.1997) (noting that for purposes of the scope-of-employment issue, the plaintiff's disputed contention that her supervisor assaulted her was to be accepted as true). At this stage of the process, the government's notice of substitution and certification petition are comparable to a motion for summary judgment, and the plain-

tiff's allegations of fact are accepted as true for purposes of contesting the government's motion. *See Wilson*, 902 F.Supp. at 679 (holding that the government's motion to substitute based on its certification petition is treated like a motion for summary judgment); *see also Schrob v. Catterson*, 967 F.2d 929, 935 (3rd Cir.1992) (noting that prior to the Westfall Act, questions of official immunity were resolved through summary judgment or dismissal early in the case).

### B. Respondeat Superior Law.

#### 1. What Law Applies.

■ In determining whether the United States Attorney's certification under the FTCA is proper, the law of the state where the conduct occurred is applied. *See Williams v. United States*, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955); *Gutierrez de Martinez v. Drug Enforcement Admin.*, 111 F.3d 1148, 1156 (4th Cir.1997); *Jamison v. Wiley*, 14 F.3d 222, 227 n. 2 (4th Cir.1994). Virginia law clearly applies in this case, since the alleged tortious conduct by Dr. Latif occurred in Virginia, where Dr. Latif was employed.

#### 2. Who Resolves Issues of Respondeat Superior Liability.

In 1995 and 1996 the Supreme Court of Virginia decided two cases generally understood to alter the respondeat superior doctrine in Virginia. In *Commercial Business Systems, Inc. v. BellSouth Services, Inc.*, 249 Va. 39, 453 S.E.2d 261 (Va.1995), the trial court granted summary judgment for an employer, holding that an employee's intentional acts of fraud, namely commercial bribes procured in exchange for business contracts, were not within the scope of his employment. In *Plummer v. Center Psychiatrists, Ltd.*, 252 Va. 233, 476 S.E.2d 172 (Va.1996), the trial court had granted the employer's demurrer, holding that a psychiatrist who sexually assaulted a patient during treatment could not be held to have acted within the scope of his employment. In both cases, the Supreme Court of Virginia reversed, holding that the trial courts erred by concluding as a matter of law that the intentional torts of the

employees did not occur within the scope of their employment.

██ While these decisions establish that an employee's intentional tort can be imputed to the employer under certain circumstances, they clearly do not stand for the proposition that intentional torts which occur during the course of the employee's duties are per se imputable to the employer. To the contrary, in both cases, what the Supreme Court of Virginia found objectionable was that the issues had not been allowed to proceed to juries for resolution. The clear import of both decisions is that determining whether an employer can be held liable for an employee's intentionally tortious act is a fact-intensive exercise generally to be left to the fact finder. *See Young v. Sheetz, Inc.,* 987 F.Supp. 496, 503 (W.D.Va.1997) (observing that in *Plummer,* the Virginia Supreme Court indicated "that summary judgment as to respondeat superior is rarely appropriate"); *Kidwell v. Sheetz, Inc.,* 982 F.Supp. 1177, 1187 (W.D.Va.1997) (stating that "*Plummer* appears to admonish that the issue of whether an offending employee was or was not acting within the scope of his employment is one for a jury to decide"); *Bell-South,* 453 S.E.2d at 265 (noting that "[o]ften the inferences to be drawn from the facts proved are within the province of a jury"); *Tri–State Coach Corp. v. Walsh,* 188 Va. 299, 49 S.E.2d 363, 367 (Va.1948) (holding that "[t]he inferences to be drawn from the facts proved are often within the province of the jury").

██ Under the Westfall Act, in conjunction with the FTCA, the "plaintiff seeking relief against a federal employee is not entitled to a jury trial on the scope-of-employment issue, even if the relevant state law would provide a jury trial." *Gutierrez,* 111 F.3d at 1153 (citation omitted). Therefore the district court, sitting without a jury, is the fact finder and must resolve disputed issues of fact resulting from a challenge to a scope-of-employment certification. *Id.*

### 3. How Respondeat Superior Liability Under Virginia Law is Determined.

That respondeat superior decisions often turn on subtle distinctions in the facts, to be left to the province of the fact finder, is due in large part to the fact that there is no bright line to apply in determining when liability attaches to the employer. *See Brittingham v. United States,* 972 F.Supp. 1014, 1017 n. 7 (E.D.Va.1997) (noting that "the location of the line demarcating those intentional torts that occur in the employer's service from those that do not may be indistinct, even to the practiced judicial eye"); *Bell-South,* 453 S.E.2d at 265 (opining that "[a]lthough the doctrine of respondeat superior is firmly established in Virginia, difficulties commonly arise in applying the doctrine to particular facts"); *Tri–State Coach,* 49 S.E.2d at 367 (stating that "[the scope-of-employment] principle is well-established, but the exact line of demarcation between what acts are within the scope of employment and what are not is, at times, difficult of ascertainment").

The difficulty in applying respondeat superior doctrine in Virginia is further compounded by the recent arguably inconsistent articulations of the respondeat superior standard. In *BellSouth* and *Plummer* the Virginia Supreme Court stated the test as follows:

> The courts ... have long since departed from the rule of non-liability of an employer for wilful or malicious acts of his employee. Under the modern view, the wilfulness or wrongful motive which moves an employee to commit an act which causes injury to a third person does not of itself excuse the employer's liability therefor. The test of liability is not the motive of the employee in committing the act complained of, but whether that act was within the scope of the duties of employment and in the execution of the service for which he was engaged.

*Plummer,* 476 S.E.2d at 174; *BellSouth.,* 453 S.E.2d at 266 (quoting *Tri–State Coach,* 49 S.E.2d at 366). Shortly after *Plummer* was decided, however, the Fourth Circuit stated its preference for the test elucidated in an earlier Virginia decision:

> Under Virginia law, an employee acts within the scope of his employment if: "(1) [The act] was expressly or impliedly di-

rected by the employer, or is naturally incident to the business, and (2) it was performed, although mistakenly or ill-advisedly, with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business, 'and did not arise wholly from some external, independent, and personal motive on the part of the [employee] to do the act upon his own account.'"

*Gutierrez*, 111 F.3d at 1156 (quoting *Kensington Assocs. v. West*, 234 Va. 430, 362 S.E.2d 900, 901 (Va.1987)).

Although the cases emphasize the primary role of the fact finder in determining the scope of employment, the two standards can lead to contrasting results. As Judge Michael of this court has noted, "it is difficult to reconcile the broad standard elucidated in *BellSouth* with the narrower standard [of *Kensington*]." *Bowerman v. Industrial Towel Supply, Inc.*, No. CIV.A. 94–00088–H, 1996 WL 173139, at *7 (W.D.Va. April 10, 1996). The fact finder could conclude, on the one hand, that the service (under the *BellSouth* standard) in which the tortious act was committed was "within the ordinary course of business or within the scope of authority." *Id.* On the other hand, a fact finder could likewise conclude that the same tortious act arose wholly from some external, independent, and personal motive (under the *Kensington* standard) and thus was "without the scope of employment." *Id.* This dichotomy in legal formulation encourages the tendency to leave scope-of-employment determinations to the fact finder, since trial courts are hard pressed to decide upon the appropriate legal standard.[4]

The source of the two standards is ironically the same case. In *Tri–State Coach* the Supreme Court of Virginia painted a broad brush of respondeat superior doctrine across

its holding—not only quoting the identical language cited by *Plummer* and *BellSouth*, but also adopting the "scope of employment" definition used in *Kensington* and cited favorably in *Gutierrez*. *Tri–State Coach*, 49 S.E.2d at 366, 367.

The Virginia Supreme Court has used both liability standards in the same opinion more than once since *Tri–State Coach*, and consequently, the practice of merging these standards should not be seen as an anomalous result. *See, e.g., United Brotherhood of Carpenters v. Humphreys*, 203 Va. 781, 127 S.E.2d 98, 101–102 (Va.1962) (citing the broad and narrow standards); *accord Broaddus v. Standard Drug Co.*, 211 Va. 645, 179 S.E.2d 497, 503–04 (Va.1971). Most recently, the district court in *Brittingham*, 972 F.Supp. 1014, followed the pattern set in *Tri–State Coach*, citing both the *Kensington* two-part definition and the broader "duties" and "service" liability concept adopted in *Plummer*. *Brittingham*, 972 F.Supp. at 1017. Even the Fourth Circuit's decision in *Gutierrez*, although resting entirely on the *Kensington* standard, recognizes the *Plummer* holding and Virginia's "broad view of the employment relationship." *Gutierrez*, 111 F.3d at 1156, 1158.

As a general matter, it is well established that Virginia courts take a broad view of scope of employment, a fact best exemplified by the holdings in *Plummer* and *BellSouth*. *Gutierrez*, 111 F.3d at 1156; *Brittingham*, 972 F.Supp. at 1017. Moreover, the *Plummer* opinion and its broad liability standard represent the most recent pronouncement of scope-of-employment doctrine by Virginia's highest court.

As the Fourth Circuit has noted, however, there are limits to how widely the scope-of-employment net should be cast. *Gutierrez*, 111 F.3d at 1156 (noting that despite the

---

4. Judge Michael observed that, in practice, "[s]uch confusion militates toward a per se rule by which courts never grant summary judgment ... because it is never clear how [a] court should, as a matter of law, resolve the case falling without the reach of [*Kensington*] yet ensnared by the broad net of *BellSouth*." *Bowerman v. Industrial Towel Supply, Inc.*, No. CIV.A. 94–00088–H, 1996 WL 173139, at *7 (April 10, 1996). *See, e.g., Young*, 987 F.Supp. 496 (summary judgment denied); *Kidwell*, 982 F.Supp. 1177 (summary judgment denied); *Plummer*, 252 Va. 233, 476 S.E.2d 172 (demurrer for employer reversed); *Hott v. VDO Yazaki Corp.*, 922 F.Supp. 1114 (W.D.Va.1996) (summary judgment denied); *Doe v. United States*, 912 F.Supp. 193 (E.D.Va.1995) (summary judgment denied); *BellSouth*, 249 Va. 39, 453 S.E.2d 261 (summary judgment for employer reversed).

holdings in *BellSouth* and *Plummer*, "[t]here are, however, limits"). Identifying these limits within Virginia's case law becomes, therefore, the essential task of this court. But while the *BellSouth* and *Plummer* decisions make clear that Virginia courts prefer scope-of-employment determinations be made by the fact finder, those decisions do not clearly reveal what facts guide the inquiry and prove ultimately dispositive of the limits of an employer's liability for intentional torts. For example, the *Plummer* decision failed to specify what part of the plaintiff's factual case dictated that the employer was acting within the scope of employment. Rather, the court simply held that there were insufficient facts to rule as a matter of law that the doctor's acts represented only a slight deviation from his scope of employment on the one hand or a marked and unusual one on the other. *Id.* at 175; *see Broaddus*, 179 S.E.2d at 504.

To discover what facts may be probative of the scope-of-employment inquiry, therefore, I turn to an analysis of the relevant case law.

Notwithstanding Virginia's broad view of the scope of employment generally, a majority of courts find in this specific context that "government social workers or health professionals wrongfully engaging in sexual activity with clients or patients are ... outside the scope of employment." 2 Lester S. Jayson, *Handling Fed. Tort Claims* § 9.07[4], at 9–211 to 9–212 (Aug.1997). Most jurisdictions follow some form of the test found in section 228 of the Restatement (Second) of Agency.[5] Virginia respondeat superior doctrine does not expressly adopt the Restatement test, but to the extent that the *Kensington* definition remains viable after *Plummer*, that definition has its roots in the Restatement as well.[6]

Read in congruence with the *Kensington* definition, however, the Virginia court in *Plummer* held that an employee's wilful or wrongful motive is but part of the determination; more important is whether the act was "within the scope of the duties of employment and in the execution of the service for which [the employee] was engaged." *Plummer*, 476 S.E.2d at 174 (quoting *BellSouth*, 453 S.E.2d at 266).[7] In the present case, Virginia's respondeat superior doctrine dictates that I look not only to the alleged motives of the doctor but also to the doctor's acts in the context of his normal duties of employment and the services he was employed to perform. I now turn to an analysis of these principles in the relevant case law.

The Virginia court in *Plummer* noted two particular features of the plaintiff's case in making its holding. First, the court applied the *BellSouth* test and held that, provided the plaintiff's allegations that her doctor had sexual intercourse with her during therapy were proven true, a jury could find the doctor was acting within the scope of his employment. *Plummer*, 476 S.E.2d at 174. Put simply, the plaintiff's factual allegations created a triable jury issue as to whether the doctor's acts were committed during the performance of his duties as a psychologist and while engaged in the counseling and therapy services for which he was employed. *Id.*

Second, and of added importance to the court, was the plaintiff's allegation that the doctor had used his "education, experience, and knowledge of the plaintiff ... [to *overcome* ] *her will* so that she was unable to act with volition." *Id.* at 175 (emphasis added ) (internal quotations omitted). This second finding bolsters the first under Virginia law, as a patient unable to act with volition may be coerced to participate or even consent to sexual relations as part of treatment or ther-

---

**5.** *See* Paul A. Clark, *Tort Law Applying Respondeat Superior to Psychotherapist–Patient Sexual Relationships*, 21 Am. J. Trial Advoc. 439, 439–40 (1997). The Restatement test reads, in pertinent part, that the "[c]onduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228 (1958).

**6.** *See* 2 Lester S. Jayson, *Handling Fed. Tort Claims* § 9.07[1], at 9–173 to 9–174, 9–174 n. 19 (March 1998) (citing scope of employment factors from the Restatement (Second) of Agency § 229 (1958)).

**7.** *See also* Clark, *supra* note 5, at 443.

apy. Prior to the holdings in *BellSouth* and *Plummer*, the Fourth Circuit seemed unlikely to entertain the notion that such actions by a doctor would still be within the scope of employment. *See, e.g., Andrews v. United States*, 732 F.2d 366 (4th Cir.1984) (applying South Carolina law and holding that such conduct by a therapist during psychological counseling sessions furthered the employee's self interest, not the employer's, and thus did not constitute a bona fide part of the therapy the therapist had been hired to provide). The broader *BellSouth* standard allows that a doctor's use of his professional office to dupe an unwitting or compromised patient into submission may be credibly seen as a continuation of the doctor's duties and services and thus within the scope of employment. *See e.g., Doe*, 912 F.Supp. at 193–94 (holding under *BellSouth* that a jury issue was created by the plaintiff's allegations that her psychologist had engaged in a sexual relationship with her during hypnotherapy sessions, while at the same time disabling her conscious recollection of such events). In *Plummer*, this compromised state alleged by the plaintiff was seemingly a chief, factual predicate for sending the case to the jury.

Since the decision in *Plummer*, Virginia law has been applied in two reported decisions which are also relevant to my inquiry here, *Gutierrez de Martinez v. Drug Enforcement Administration*, 111 F.3d 1148 (4th Cir.1997), and *Brittingham v. United States*, 972 F.Supp. 1014 (E.D.Va.1997).[8]

In *Gutierrez*, the Fourth Circuit was presented with the question of whether a Drug Enforcement Agency ("DEA") special agent was acting within the scope of his federal employment when his vehicle collided with that of the plaintiffs. 111 F.3d at 1150. The agent had been drinking with other agents that night, but in accordance with DEA policy governing agent safety after dark, proceeded to escort a fellow female agent to her

hotel. *Id.* The accident occurred en route to the hotel. *Id.*

Within the stated facts, the court based its scope-of-employment analysis solely on the *Kensington* two-part definition and found the actions to be within the scope of employment. *Gutierrez*, 111 F.3d at 1157–58. First, the court noted that the agent's decision to accompany his female coworker after dark to her hotel was, under *Kensington*, "expressly or impliedly directed by the employer." *Gutierrez*, 111 F.3d at 1157. Second, the court opined that the agent's consumption of alcohol alone was not enough to push his actions outside the scope of employment, nor was there, unlike in *Kensington* itself, a specific departmental prohibition against employees drinking while performing acts within the scope of their employment. Consequently, the agent was held not to be acting, under *Kensington*, "wholly from an independent, external, and personal motive," but instead deemed to be "attempting to further his employer's interests by observing a [company] policy." *Gutierrez*, 111 F.3d at 1158.

The district court in *Brittingham* was presented with the question of whether a supervisory patent examiner at the United States Patent and Trademark Office was acting within the scope of his federal employment when he committed an intentional tort on one of his employees. 972 F.Supp. at 1015. While at work, the supervisor entered another employee's office in an attempt to discipline him for attitude problems. *Id.* In the process of doing so, the plaintiff was asked to leave and then grabbed by the shoulders by the supervisor, shaken violently, and pushed out of the office. *Id.*

In its analysis of the facts, the court went one step further than both the *Plummer* and *Gutierrez* decisions and applied both *Kensington* and *BellSouth* liability standards as "settled Virginia principles." *Brittingham*,

---

**8.** This district court has had opportunities in another context to address the impact of the *BellSouth* and *Plummer* decisions, while applying agency law principles in Title VII cases. *See Kidwell v. Sheetz, Inc.*, 982 F.Supp. 1177 (W.D.Va.1997); *Young v. Sheetz, Inc.*, 987 F.Supp. 496 (W.D.Va.1997). These cases were limited to the consideration of summary judgment motions made by the employers, and there-

fore neither involved a factual determination by the court on the scope-of-employment issue. Of course, in most cases the plaintiff contends that the defendant's employee was acting within the scope of employment, in order to fix liability on the defendant. In the present case, the traditional roles are reversed and it is the plaintiff who argues that the employee was acting outside the scope of his employment.

972 F.Supp. at 1017–18. First, the court stated the scope definition cited in *Kensington* and repeated in *Gutierrez*. *Brittingham,* 972 F.Supp. at 1017. Applying that definition, the court noted that the only material issue of dispute between the plaintiff and the defendant was the relevant motivation leading to the assault and battery. *Id.* at 1018. Based on the facts of the case, the court found that the actions did not arise "from wholly external independent, and personal motives." *Id.* The alleged tort was found to have resulted from an event occurring "at work, during working hours," and for work-related reasons.[9]

Applying the liability standard from *Bell-South,* the court in *Brittingham* held that under the facts of the case, the service of disciplining an employee was within the ordinary course of the employer's business and within the scope of the supervisor's authority. *Brittingham,* 972 F.Supp. at 1018. In fact, the court noted that the parties were in agreement that there was no independent motive to commit a tortious act on the plaintiff in particular—she just got in the way of her supervisor's attempt to speak with another employee in private in furtherance of reprimanding him for his attitude. *Id.* As the court stated, "[t]hese facts compel the conclusion that the alleged assault was part of the service of disciplining [the other employee] and was therefore within the scope of ... employment." *Id.*

■ Having heard the evidence, and assuming within my limited inquiry into the scope of employment that the plaintiff's allegations concerning sexual battery are true, I note the following facts, which are dispositive in this case.

Unlike the plaintiff in *Plummer,* Webb has not alleged facts showing that the sexual acts by the doctor were arguably part of his medical services. For example, the alleged facts do not show that Webb was hypnotized

during her encounters with Dr. Latif, as was the case in *Doe,* or that her will was overcome, rendering her unable to act with volition, as in *Plummer.* In fact, Webb makes very clear that the alleged tortious acts by Dr. Latif were not part of the normal course of treatment or therapy in her case or in any way consented to by her.

For example, Webb states that once Dr. Latif started to feel her breasts during her first visit on December 10, she "knew it wasn't right," and told him "I just had a breast exam a week ago." (Tr. at 26.) In fact, Webb asserts that she went to the clinic on the 10th for "a regular, scheduled appointment for [her] panic attacks," and returned again on the 13th because of "a severe panic attack." (Tr. at 25, 34.) She did not complain of pain in her breasts during either occasion, nor was the doctor's alleged conduct plausibly incident to a regular examination. (Tr. at 62.) In fact, Webb's normal monthly checkups have involved conversations between her and the clinic staff to see how she was doing, monitoring of her heart rate and blood pressure, updating of her prescriptions, and on occasion, listening to her lungs. (Tr. at 44.) Confronted with Dr. Latif's abnormal actions, Webb asked if something was wrong, but noted that "[h]e didn't really respond." (Tr. at 27.) From the time she started receiving yearly breast exams at age fourteen to now, at age thirty-four, Webb states that she has never had a breast exam that would resemble the conduct by Dr. Latif. (Tr. at 26–28.) Furthermore, unlike past experiences at the clinic, her encounters with Dr. Latif represent the only occasions in her "many, many years" (Tr. at 23) of receiving treatment there that a doctor was not accompanied by another staff person during a breast exam. (Tr. at 25.)

Following her encounter with Dr. Latif on December 10, Webb told the secretary at the clinic that the doctor had made her "very

**9.** Of importance to the court's analysis of the supervisor's motive in *Brittingham v. United States* was the plaintiff's failure to meet her basic evidentiary burden—namely, to produce specific evidence or the forecast of specific evidence that the reprimand leading to the alleged tortious assault and battery was for reasons not related to work. 972 F.Supp. at 1018 n. 8. Thus, under the

applicable procedure for challenging a certification by the government, the plaintiff had failed to rebut the government's prima facie showing and consequently rendered the certification conclusive as a matter of law. *See generally Gutierrez,* 111 F.3d 1148. Such is plainly not the case here.

uncomfortable." (Tr. at 33.) She states that she did not do more about it the first time because she "didn't think about it happening again." (Tr. at 49.) When the same thing began to occur again on December 13, Webb confronted Dr. Latif:

I said, I didn't understand why he was doing it, and I asked him why it was necessary, and he still didn't respond. And I got up, I just got up, I pulled my bra down and I pulled my shirt down, and I got up and sat down in the chair. . . . He came over . . . and kept pulling my face up right in his pelvic area again, and he kept grabbing my hands, and he had me stand up again, and he kept massaging my neck and back, and I jerked away. At that time he was standing behind me, and he reached around and grabbed my breasts with both hands, both my breasts from behind me, and I jerked away from him.

(Tr. at 34–35.)

Citing the *BellSouth* standard, the United States argues in response that "[i]t is apparent from Plaintiff's own allegations that at the time of the alleged incident, Dr. Latif was performing his duties as a medical practitioner and examining Plaintiff at the Stone Mountain Health Services for medical complaints—the services for which he was employed." (Reply to Pl.'s Opp'n to Mot. to Dismiss, April 13, 1998, at 7.) I do not agree.

First, under *Kensington*, I note that the plaintiff's alleged facts support the conclusion that the commencement of each physical exam of Webb on December 10 and 13 was undertaken by Dr. Latif incident to his employer's business, if not at the express or implied direction of the employer. Undeniably, the encounters with Webb occurred at Dr. Latif's place of work and during working hours.

Under the second prong of the *Kensington* definition, however, Dr. Latif's alleged actions cannot credibly be seen as the natural consequence of an attempt to do his employer's business. Rather, the alleged sexual battery was neither part of Webb's treatment or therapy nor consented to by her, making Dr. Latif's subsequent course of action wholly rooted in some external, independent, and personal motive on his part. Further cementing the fact that Dr. Latif acted from motives unrelated to the business of the clinic is his own testimony, wherein he states that the conduct, as alleged by the plaintiff, is "medically inappropriate" when engaged in by a physician. (Tr. at 71.) It is also clearly established that Dr. Latif's alleged conduct was prohibited, on a general basis, by his employment agreement and by his employer's policies. These facts are further evidence that the alleged conduct was outside the scope of Dr. Latif's employment.[10]

Of course, under the *Plummer* test now favored in Virginia, the motives of Dr. Latif will not suffice to end the inquiry. But although motive as a factor is deemed secondary to the service or duties performed under the *BellSouth* test, the *Brittingham* court found the absence of a personal motive consequential to the court's inquiry under the *BellSouth* standard. The converse would appear to be true as well. In other words, where the alleged facts show the presence of a motive on the part of the doctor concerning the particular plaintiff, the court's inquiry into whether the doctor was still performing his duties of employment and engaged in services for which he was employed under *BellSouth* is affected.

Here, as I have noted above, the facts show clearly that Dr. Latif had begun to act on his own personal and independent motive, wholly external from the business of the clinic. For Dr. Latif to be seen under Virginia law as performing the duties of his employment and in the execution of the service for which he was engaged, the required factual showing is straightforward: the doctor must have maintained his status as a doctor

---

10. In *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343 (4th Cir.1995), a Title VII case, the Fourth Circuit found the sexual assaults complained of to be foreseeable by the employer because they were specifically prohibited in an employer manual. Here, however, there is no evidence that any professional (or other) employee of Stone Mountain Health Services had previously committed a sexual assault or battery on a patient, or that the general prohibitions of the employment agreement or the sexual harassment policy were enacted because of any expectation by the employer that the specific acts alleged by the plaintiff here might foreseeably occur.

and performed acts, if not comparable to treatment or therapy, at least perceived to be so in the eyes of his patient. On the facts here, Dr. Latif's actions clearly departed from the normal course of treatment for a person of Webb's condition. Nor can his sexual battery be plausibly seen as part of the therapy being administered. Furthermore, Dr. Latif did not address the plaintiff's concerns regarding his actions, choosing to continue in spite of her protestations. The alleged facts clearly show that the doctor's actions were neither consented to in advance nor submitted to by the plaintiff in any way. Instead, when Dr. Latif would not abandon his course of action, Webb removed herself. I find that when the doctor's actions ceased to resemble services related to treatment or therapy and became instead reasonably perceived wrongful acts, the doctor had departed from the performance of his duties and gone outside the scope of his employment.

### C. Plaintiff's Motion to Amend to Allege Negligence.

The plaintiff's motion for leave to file a second amended complaint to sound in negligence cannot be granted. Because no negligence claim has been presented to the agency, as required under the FTCA, Webb has not properly exhausted her administrative remedies. See 28 U.S.C.A. § 2675(a) (West 1994). Accordingly, any such amended complaint would be subject to dismissal, and thus the amendment would be futile.

Moreover, even had the plaintiff duly exhausted her administrative remedies, the motion to amend would be denied. The facts of this case simply do not support such an amendment to the pleadings.

■ The FTCA's intentional torts exclusion exempts from the provisions of the FTCA and section 1346(b) "[a]ny claim arising out of ... [assault or battery] ..." 28 U.S.C.A. § 2680(h). However, 42 U.S.C.A. § 233(e) provides a limited exception to this exemption under the FTCA, providing that:

For purposes of this section, the provisions of section 2680(h) of Title 28 shall not apply to assault or battery arising out of negligence in the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigations.

42 U.S.C.A. § 233(e) (West 1991). This exception does not apply, however, to cases which sound in negligence but are based on the commission of an intentional tort. See United States v. Shearer, 473 U.S. 52, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985). As the Court said in Shearer:

[Plaintiff] cannot avoid the reach of § 2680(h) by framing her complaint in terms of negligent failure to prevent the assault and battery. Section 2680(h) does not merely bar claims for assault or battery; in sweeping language it excludes any claim arising out of assault or battery. We read the provision to cover claims like respondent's that sound in negligence but stem from a battery committed by a Government employee.

473 U.S. at 55, 105 S.Ct. 3039. The Fourth Circuit has read the Shearer decision's interpretation of section 2680(h) broadly, "effectively barring any claim involving an assault or battery, at least where a government employee committed the intentional tort." Wise v. United States, 8 F.Supp.2d 535, 543 (E.D.Va.1998); see Thigpen v. United States, 800 F.2d 393, 394 (4th Cir.1986); Hughes v. United States, 662 F.2d 219, 220 (4th Cir. 1981).

■ The gravamen of Webb's case remains her allegations of intentional sexual battery. Having heard her testimony as to the events of her contacts with Dr. Latif, I find that this is simply not a negligence case.

### IV. Conclusion.

For the foregoing reasons, I will deny the plaintiff's pending motion to amend her complaint. I will also vacate the scope-of-employment certification filed by the United States Attorney. Under the circumstances, the plaintiff's federal claim against the United States must be dismissed on the basis of the FTCA's intentional tort exclusion. Dr. Latif will be reinstated as a defendant, although no federal claim may be asserted against him, because he acted outside of the scope of his employment.

The amended complaint filed by the plaintiff which added Dr. Latif as a defendant also asserts subject matter jurisdiction on the basis of diversity of citizenship [11] and alleges a state cause of action. Accordingly, the action will proceed against Dr. Latif alone on that basis.

Accordingly, it is **ORDERED** as follows:

1. The motion to amend the complaint (Doc. No. 14) is denied;

2. The scope-of-employment certification filed by the United States Attorney is vacated;

3. The motions to dismiss (Doc. Nos. 2 and 8) are granted to the extent that the United States and any claims under the provisions of the FTCA are dismissed on the basis of 28 U.S.C.A. § 2680(h);

4. Dr. Zubair Latif is reinstated as a defendant and must file responsive pleadings to the amended complaint within twenty (20) days of this order; and

5. The clerk will send copies of the opinion and order to counsel of record and to Dr. Zubair Latif.

---

11. The amended complaint alleges Dr. Latif to be a resident and citizen of Tennessee (Am. Compl.¶ 3), but at the hearing he testified that he is now a resident of Maryland. (Tr. 67.) The plaintiff is a resident of Virginia.